# Exhibit A

**STATE *of* DELAWARE**
**CERTIFICATE *of* INCORPORATION**
**A STOCK CORPORATION**

State of Delaware
Secretary of State
Division of Corporations
Delivered 10:02 AM 11/12/2019
FILED 10:02 AM 11/12/2019
SR 20198024804 - File Number 7699432

**ARTICLE I.**

The name of this Corporation is LIFEVOXEL.AI INC.

**ARTICLE II.**

Its registered office in the State of Delaware is to be located at 651 N. BROAD ST., SUITE 206, MIDDLETOWN, DE 19709. The county of the registered office is NEW CASTLE. The registered agent in charge thereof is LEGALINC CORPORATE SERVICES INC..

**ARTICLE III.**

The total number of shares of common stock that the corporation shall be authorized to issue is 1000000 at $0.01 par value.

**ARTICLE IV.**

The purpose of the corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

**ARTICLE V.**

The name and mailing address of the incorporator is Lovette Dobson at 17350 State Hwy 249 #220, Houston, TX 77064.

**I, the undersigned,** for the purpose of forming a corporation under the laws of the State of Delaware, do make, file and record this Certificate, and do certify that the facts herein stated are true, and I have accordingly hereunto set my hand and executed this Certificate of Incorporation on the date below.

**Dated:** November 11th, 2019

*Lovette Dobson*

Lovette Dobson, Incorporator

# Exhibit B

**SPECIAL RESOLUTION**
**BY CONSENT**
**OF THE SHAREHOLDERS**
**OF AI VISUALIZE, INC.**

The undersigned, being the majority Shareholders and Directors of AI Visualize, Inc.**,** a Texas corporation (the "Company"), effective as of August 1, 2021, hereby take the following actions and adopt the following resolutions by their consent, pursuant to the provisions of the Articles of Association of the Company:

**WHEREAS,** AI Visualize Inc. in its present state is unable to raise capital from investors to grow due to its current cap table structure and therefore unable to build shareholder value;

**WHEREAS,** an independent entity formed with license from AI Visualize upon cleaning up AI Visualize cap table, would allow such an independent entity to raise capital to build shareholder value;

**WHEREAS,** there are potential investors that have shown interest in investing substantial capital in to such an independent entity in the form of a SAFE Note;

**WHEREAS,** AI Visualize Inc. shareholders shall be been given the opportunity to transfer their contribution from AI Visualize to the standalone entity in the said SAFE Note, or return the shareholders' investment;

**WHEREAS,** the Board of Directors of the Company have consulted with legal counsel and advisors as to matters they reasonably believe are within their professional or expert competence, and have been advised that it is in the best interest of the Company to separate LifeVoxel.AI Inc, a Delaware C-Corporation shell company wholly owned by AI Visualize Inc., to become its own standalone entity as defined in the internal revenue code, under the laws of the state of Delaware (the "Corporation"), with its promoters as initial equity holders and the said shareholders transfer their investment from AI Visualize Inc to SAFE Note in LifeVoxel.AI Inc,

and to enter into a Perpetual License Agreement with respect to Healthcare related Intellectual Property belonging to the Company, to be described in more detail in a license agreement;

**WHEREAS**, the Board of Directors has developed a good faith and honest belief that this action will be in the best interests of the Company; and

**WHEREAS**, the Board of Directors has made itself available to answer any and all questions the shareholders may have with respect to this proposal and to provide such information as the shareholders may reasonably require to make an informed decision;

**WHEREAS,** the Company seeks majority shareholders consent to take all necessary steps to organize the Corporation and transfer the Company's assets and liabilities to the Corporation in exchange for its initial shares;

**WHEREAS**, pursuant to Article III, Section 6(d) of the Articles of Association, the undersigned shareholders, being a majority, have elected to vote in lieu of a meeting indicting that they consent to the proposal suggested by the Board of Directors.

**NOW THEREFORE, BE IT**

**RESOLVED**, that the majority Shareholders hereby approve, ratify and adopt through their consent, effective immediately, and authorize the Board of Directors to take all necessary steps to separate LifeVoxel.AI Inc, a Delaware C-Corporation shell company wholly owned by AI Visualize Inc., to become its own standalone entity as defined in the internal revenue code, under the laws of the state of Delaware (the "Corporation"), with its promoters as initial equity holders and the said shareholders transfer their investment from AI Visualize Inc to SAFE Note in LifeVoxel.AI Inc, and to enter into a Perpetual License Agreement with respect to Healthcare related Intellectual Property belonging to the Company, to be described in more detail in a license agreement.

[Signature pages follows]

IN WITNESS WHEREOF, the undersigned has made this instrument effective as of the date first written above.

By

_____
Kovey Kovalan,
As Director of KOVEY LLC

By

_____
Linh Le,
As Director of KOVEY LLC

# Exhibit C

## POST-MONEY VALUATION CAP WITH DISCOUNT

THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED IN THIS SAFE AND UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

### LIFEVOXEL.AI, INC.

### SAFE
### (Simple Agreement for Future Equity)

THIS CERTIFIES THAT in exchange for the payment by [Investor Name] (the "**Investor**") of $50,000 (the "**Purchase Amount**") on or about October 28, 2021, LifeVoxel.AI, Inc., a Delaware corporation (the "**Company**"), issues to the Investor the right to certain shares of the Company's Capital Stock, subject to the terms described below.

This Safe is one of the forms available at http://ycombinator.com/documents and the Company and the Investor agree that neither one has modified the form, except to fill in blanks and bracketed terms.

The "**Post-Money Valuation Cap**" is $60,000,000.

The "**Discount Rate**" is 80%.

See **Section 2** for certain additional defined terms.

1. *Events*

(a) **Equity Financing**. If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Conversion Price.

In connection with the automatic conversion of this Safe into shares of Safe Preferred Stock, the Investor will execute and deliver to the Company all of the transaction documents related to the Equity Financing; *provided,* that such documents (i) are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the Safe Preferred Stock if applicable, and (ii) have customary exceptions to any drag-along applicable to the Investor, including (without limitation) limited representations, warranties, liability and indemnification obligations for the Investor.

(b) **Liquidity Event**. If there is a Liquidity Event before the termination of this Safe, this Safe will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds, due and payable to the Investor immediately prior to, or concurrent with, the consummation of such Liquidity Event, equal to the greater of (i) the Purchase Amount (the "**Cash-Out Amount**") or (ii) the amount payable on the number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price (the "**Conversion Amount**"). If any of the Company's securityholders are given a choice as to the form and amount of Proceeds to be received in a Liquidity Event, the Investor will be given the same choice, *provided* that the Investor may not choose to receive a form of consideration that the Investor would be ineligible to receive as a result of the Investor's failure to satisfy any requirement or limitation generally applicable to the Company's securityholders, or under any applicable laws.

Notwithstanding the foregoing, in connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce the cash portion of Proceeds payable to the Investor by the amount determined by its board of directors in good faith for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, provided that such reduction (A) does not reduce the total Proceeds payable to such Investor and (B)

© 2020 Y Combinator Management, LLC. This form is made available under a Creative Commons Attribution-NoDerivatives 4.0 License (International): https://creativecommons.org/licenses/by-nd/4.0/legalcode. You may modify this form so you can use it in transactions, but please do not publicly disseminate a modified version of the form without asking us first.

**POST-MONEY VALUATION CAP WITH DISCOUNT**

is applied in the same manner and on a pro rata basis to all securityholders who have equal priority to the Investor under Section 1(d).

      (c) **Dissolution Event**.  If there is a Dissolution Event before the termination of this Safe, the Investor will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds equal to the Cash-Out Amount, due and payable to the Investor immediately prior to the consummation of the Dissolution Event.

      (d) **Liquidation Priority**.  In a Liquidity Event or Dissolution Event, this Safe is intended to operate like standard non-participating Preferred Stock.  The Investor's right to receive its Cash-Out Amount is:

            (i)      Junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock);

            (ii)      On par with payments for other Safes and/or Preferred Stock, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such other Safes and/or Preferred Stock, the applicable Proceeds will be distributed pro rata to the Investor and such other Safes and/or Preferred Stock in proportion to the full payments that would otherwise be due; and

            (iii)      Senior to payments for Common Stock.

      The Investor's right to receive its Conversion Amount is (A) on par with payments for Common Stock and other Safes and/or Preferred Stock who are also receiving Conversion Amounts or Proceeds on a similar as-converted to Common Stock basis, and (B) junior to payments described in clauses (i) and (ii) above (in the latter case, to the extent such payments are Cash-Out Amounts or similar liquidation preferences).

      (e) **Termination**.  This Safe will automatically terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this Safe) immediately following the earliest to occur of: (i) the issuance of Capital Stock to the Investor pursuant to the automatic conversion of this Safe under Section 1(a); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b) or Section 1(c).

    2.   *Definitions*

      "**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock**."

      "**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

      "**Company Capitalization**" is calculated as of immediately prior to the Equity Financing and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;

Version 1.1

## POST-MONEY VALUATION CAP WITH DISCOUNT

- Includes all Converting Securities;
- Includes all (i) issued and outstanding Options and (ii) Promised Options; and
- Includes the Unissued Option Pool, except that any increase to the Unissued Option Pool in connection with the Equity Financing shall only be included to the extent that the number of Promised Options exceeds the Unissued Option Pool prior to such increase.

"**Conversion Price**" means either: (1) the Safe Price or (2) the Discount Price, whichever calculation results in a greater number of shares of Safe Preferred Stock.

"**Converting Securities**" includes this Safe and other convertible securities issued by the Company, including but not limited to: (i) other Safes; (ii) convertible promissory notes and other convertible debt instruments; and (iii) convertible securities that have the right to convert into shares of Capital Stock.

"**Direct Listing**" means the Company's initial listing of its Common Stock (other than shares of Common Stock not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange by means of an effective registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the Company for resale, as approved by the Company's board of directors. For the avoidance of doubt, a Direct Listing shall not be deemed to be an underwritten offering and shall not involve any underwriting services.

"**Discount Price**" means the price per share of the Standard Preferred Stock sold in the Equity Financing multiplied by the Discount Rate.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary.

"**Dividend Amount**" means, with respect to any date on which the Company pays a dividend on its outstanding Common Stock, the amount of such dividend that is paid per share of Common Stock multiplied by (x) the Purchase Amount divided by (y) the Liquidity Price (treating the dividend date as a Liquidity Event solely for purposes of calculating such Liquidity Price).

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed valuation, including but not limited to, a pre-money or post-money valuation.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"**Liquidity Capitalization**" is calculated as of immediately prior to the Liquidity Event, and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all (i) issued and outstanding Options and (ii) to the extent receiving Proceeds, Promised Options;
- Includes all Converting Securities, **other than** any Safes and other convertible securities (including without limitation shares of Preferred Stock) where the holders of such securities are receiving Cash-Out Amounts or similar liquidation preference payments in lieu of Conversion Amounts or similar "as-converted" payments; and
- Excludes the Unissued Option Pool.

"**Liquidity Event**" means a Change of Control, a Direct Listing or an Initial Public Offering.

**POST-MONEY VALUATION CAP WITH DISCOUNT**

"**Liquidity Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Liquidity Capitalization.

"**Options**" includes options, restricted stock awards or purchases, RSUs, SARs, warrants or similar securities, vested or unvested.

"**Proceeds**" means cash and other assets (including without limitation stock consideration) that are proceeds from the Liquidity Event or the Dissolution Event, as applicable, and legally available for distribution.

"**Promised Options**" means promised but ungranted Options that are the greater of those (i) promised pursuant to agreements or understandings made prior to the execution of, or in connection with, the term sheet or letter of intent for the Equity Financing or Liquidity Event, as applicable (or the initial closing of the Equity Financing or consummation of the Liquidity Event, if there is no term sheet or letter of intent), (ii) in the case of an Equity Financing, treated as outstanding Options in the calculation of the Standard Preferred Stock's price per share, or (iii) in the case of a Liquidity Event, treated as outstanding Options in the calculation of the distribution of the Proceeds.

"**Safe**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations.  References to "this Safe" mean this specific instrument.

"**Safe Preferred Stock**" means the shares of the series of Preferred Stock issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Stock, other than with respect to: (i) the per share liquidation preference and the initial conversion price for purposes of price-based anti-dilution protection, which will equal the Conversion Price; and (ii) the basis for any dividend rights, which will be based on the Conversion Price.

"**Safe Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Company Capitalization.

"**Standard Preferred Stock**" means the shares of the series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the Equity Financing.

"**Unissued Option Pool**" means all shares of Capital Stock that are reserved, available for future grant and not subject to any outstanding Options or Promised Options (but in the case of a Liquidity Event, only to the extent Proceeds are payable on such Promised Options) under any equity incentive or similar Company plan.

3. *Company Representations*

(a)  The Company is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b)  The execution, delivery and performance by the Company of this Safe is within the power of the Company and has been duly authorized by all necessary actions on the part of the Company (subject to section 3(d)). This Safe constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.  To its knowledge, the Company is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material debt or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

Version 1.1

**POST-MONEY VALUATION CAP WITH DISCOUNT**

(c)  The performance and consummation of the transactions contemplated by this Safe do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material debt or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien on any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d)  No consents or approvals are required in connection with the performance of this Safe, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e)  To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

4.  *Investor Representations*

(a)  The Investor has full legal capacity, power and authority to execute and deliver this Safe and to perform its obligations hereunder. This Safe constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)  The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act, and acknowledges and agrees that if not an accredited investor at the time of an Equity Financing, the Company may void this Safe and return the Purchase Amount. The Investor has been advised that this Safe and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this Safe and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

5.  *Miscellaneous*

(a)  Any provision of this Safe may be amended, waived or modified by written consent of the Company and either (i) the Investor or (ii) the majority-in-interest of all then-outstanding Safes with the same "Post-Money Valuation Cap" and "Discount Rate" as this Safe (and Safes lacking one or both of such terms will be considered to be the same with respect to such term(s)), *provided that* with respect to clause (ii): (A) the Purchase Amount may not be amended, waived or modified in this manner, (B) the consent of the Investor and each holder of such Safes must be solicited (even if not obtained), and (C) such amendment, waiver or modification treats all such holders in the same manner. "Majority-in-interest" refers to the holders of the applicable group of Safes whose Safes have a total Purchase Amount greater than 50% of the total Purchase Amount of all of such applicable group of Safes.

(b)  Any notice required or permitted by this Safe will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

Version 1.1

**POST-MONEY VALUATION CAP WITH DISCOUNT**

(c)  The Investor is not entitled, as a holder of this Safe, to vote or be deemed a holder of Capital Stock for any purpose other than tax purposes, nor will anything in this Safe be construed to confer on the Investor, as such, any rights of a Company stockholder or rights to vote for the election of directors or on any matter submitted to Company stockholders, or to give or withhold consent to any corporate action or to receive notice of meetings, until shares have been issued on the terms described in Section 1.  However, if the Company pays a dividend on outstanding shares of Common Stock (that is not payable in shares of Common Stock) while this Safe is outstanding, the Company will pay the Dividend Amount to the Investor at the same time.

(d)  Neither this Safe nor the rights in this Safe are transferable or assignable, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this Safe and/or its rights may be assigned without the Company's consent by the Investor (i) to the Investor's estate, heirs, executors, administrators, guardians and/or successors in the event of Investor's death or disability, or (ii) to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor; and *provided, further*, that the Company may assign this Safe in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e)  In the event any one or more of the provisions of this Safe is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this Safe operate or would prospectively operate to invalidate this Safe, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this Safe and the remaining provisions of this Safe will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f)  All rights and obligations hereunder will be governed by the laws of the State of Delaware, without regard to the conflicts of law provisions of such jurisdiction.

(g)  The parties acknowledge and agree that for United States federal and state income tax purposes this Safe is, and at all times has been, intended to be characterized as stock, and more particularly as common stock for purposes of Sections 304, 305, 306, 354, 368, 1036 and 1202 of the Internal Revenue Code of 1986, as amended.  Accordingly, the parties agree to treat this Safe consistent with the foregoing intent for all United States federal and state income tax purposes (including, without limitation, on their respective tax returns or other informational statements).

*(Signature page follows)*

IN WITNESS WHEREOF, the undersigned have caused this Safe to be duly executed and delivered.

**LIFEVOXEL.AI, INC.**

By:_____

       Sekhar Puli
       President & CEO

Address: 263 Tresser Blvd, 9th Floor, Stamford, CT 06901

Email: Sekhar@LifeVoxel.com

**INVESTOR:**

By: _____

Name:_____

Title:_____

Address:_____

_____

Email:_____

# Exhibit D

**LIFEVOXEL.AI, INC. (DE) - CAP TABLE**

| CERT # | SHAREHOLDER | O. SHARES | PERCENTAGE |
|---|---|---|---|
| 1 | AI Visualize        Inc. | 20,000,000.00 | 100.00% |

# Exhibit E

# *State Of Delaware*

Entity Details

4/19/2022  5:14:20PM

File Number: 7699432

Entity Name: LIFEVOXEL.AI INC.

Entity Kind: Corporation

Residency: Domestic

Status: AR Delinquent, Tax Due

Incorporation Date / Formation Date:  11/12/2019

Entity Type:  General

State:  DELAWARE

Status Date:  3/2/2022

**Registered Agent Information**

Name:  LEGALINC CORPORATE SERVICES INC.

Address:  651 N BROAD ST SUITE 201

City:  MIDDLETOWN

State:  DE

Phone:  302-894-8922

Country:

Postal Code:  19709

**Tax Information**

Last AnnualReport Filed:   2020

Annual Tax Assessment:   $170165

Tax Due: $ 175475.96

Total Authorized Shares:  20000000

**Filing History (Last 5 Filings)**

| Seq | Description | No of Pages | Filing Date mm/dd/yyyy | Filing Time | Effective Date mm/dd/yyyy |
|---|---|---|---|---|---|
| 1 | Restated Stock | 3 | 4/22/2020 | 3:16 PM | 4/22/2020 |
| 2 | Stock Corporation | 1 | 11/12/2019 | 10:02 AM | 11/12/2019 |

# Exhibit F

 **Gmail**

Sekhar Puli <spuli.aj@gmail.com>

---

## Fwd: Decision

**Sekhar Puli** <Sekhar@lifevoxel.com>                           Tue, Dec 7, 2021 at 1:27 PM
To: Sekhar Puli <spuli.aj@gmail.com>

Sekhar Puli

Ph: 571-226-7125

---

**From:** Kovey Kovalan <kovey@lifevoxel.com>
**Date:** Monday, November 29, 2021 at 11:38 AM
**To:** Sekhar Puli <Sekhar@lifevoxel.com>
**Cc:** Joseph Sargent <jps@sargentlaw.net>
**Subject:** RE: Decision

Hi Sekhar,

Good morning.

Per your request, and regrettably, we accept your resignation. I will assume the CEO/President for AI Visualize, Inc. and LifeVoxel.AI, Inc as of today.

I have given Joe a heads up, and if you could kindly work with him to take on the next steps, that would be great. He is cc'ed.

If you could kindly send the admin account for M365, we would appreciate it.

We'll plan on orderly transition to make this seamless for everyone. I trust that Joe will handle the detail appropriately. He plans to call you but feel free to reach out to him as well.

Thank you,

Kovey - c:203-252-1414

---

**From:** Sekhar Puli <Sekhar@lifevoxel.com>
**Sent:** Monday, November 29, 2021 6:51 AM

Case 3:22-cv-01917-CAB-AGS   Document 1-2   Filed 12/02/22   PageID.65   Page 22 of 27

**To:** Kovey Kovalan <kovey@lifevoxel.com>
**Subject:** Re: Decision

Good Morning Kovey. Following up on the below to execute on my decision as per below. I am even further convinced that this is the right decision and I want to fast track this.

Sekhar Puli

Ph: 571-226-7125

---

**From:** Sekhar Puli <Sekhar@lifevoxel.com>
**Date:** Saturday, November 27, 2021 at 2:33 PM
**To:** Kovey Kovalan <kovey@lifevoxel.com>
**Subject:** Decision

Kovey

After 72 hours of sleepless nights with deep anxiety and thinking, it is with deep regret that I have come to the conclusion that this journey is not going to work out. Hearing you talk on Wednesday validated my worst nightmares and I feel gutted to come to this decision. Because of this decision, on a personal level, I will have to face severe consequences financially, market credibility, my future course of actions, friendships and relationships that invested into this journey trusting me and my judgement. However, considering the mental unrest it will cause and the deeper hole I will be digging myself continuing down this path I have made the decision to end it here.

At the surface level you might think this is a strong reaction to something that is perhaps addressable but when I played out all scenarios, I felt that it is a lose-lose situation for me as more time goes by. For me, I commit 200% and go all in or I don't, there is no in-between and I didn't feel the same reciprocity. It all came down to, will I have your support and commitment to make this company successful and based on Wednesday's conversation I don't think we are on the same page. Few things that were resonating in my head as I was deliberating on this decision process are

·   Lack of appreciation of reality

   o  Thinking that you got 5M because of what you have built over the past 10 years! When it can't be any far from reality. You have tried raising money using your past and with the team from the past, but you know what the results were, not to mention there are 10's and 100's of companies in this space that were promoting similar platforms. Money came exclusively because of the trust and confidence people had in me and my ability to make it a winner. I never used that as a leverage, I still respected your past, always elevated your past all I asked for was to keep future of the company first above the past.

   o  Your thought process that everything was fine before, and current situation is bad and willingness to go back to the day-to-day survival mode rather than understanding and solving todays issues.

   o  Last but least, not understanding the impact of folks on cap table and your past baggage's insisting that you should own more than 50%, when in reality, across both entities, you have already given away 30%+ for past investors, another 30% potentially to

employees, another 25% if you had raised 5M at 20M company valuation without even considering my equity.

  o   Reality check on why some of the companies are able to raise bigger valuations vs. why we are where we are.

·   Confusion between compassion and results oriented execution

  o   As a person we should always conduct ourselves with humility and compassion. However, we must understand how to do that and not impact the business. I tried to explain you in many ways the difference but your insistence on using compassion as the driver to execute day to day company will drain the company

  o   You are not able to understand the tangible value and past association. No denying that there is no value in the past association but if you truly want to give them something in return the best you can do is part ways, generate future value and give something back as supposed to carrying them to be compassionate and sink the entire ship.

  o   Not able to understand the value of someone who is putting 12-15 hours/day for the company and streamlining things and asking if they can go parttime as someone who is doing backend finance relays lack of understanding or not having companies best interests.

  o   With this mindset we will forever be stuck in the past and the corresponding baggage's and not move forward

·   Entrepreneur mindset – There are many things that are bundled in it but at the end of the day, it very well could be my gut feel based on some of my surface level observation's. I felt that you wanted to have the benefit of both ends of the spectrum, run a lifestyle company for your personal benefit (couple of ex: not thinking about the value of company and trying to continue to have some of the contracts staying in Voxcell cloud, charging all your lifestyle expenses to company – insurance, personal trainers, house rents etc. when the need was to separate them with the salary drawn) but at the same time build value in the company. As an early-stage start-up, it comes with giving away some of those benefits and if I had to insist that as a CEO and seasoned entrepreneur, I have to get all my perks and benefits then we won't have any money left to run the company.

·   Kishore X-Factor and all the noise from the past relationships and agreements that you have got into that we are not able to shake off.

None of these above are new, I was considering those as risks that I will have to deal with and mitigate them over a period and push through. However, our conversation on Wednesday really changed my perspective of this entire dynamics to reevaluate everything.  Forward progress is going to come at a very heavy personal toll on me pushing through all these negativities and even after that at the end when we get to a point where we are ready to exit, I am going to have to still rely on your acceptance of the value, and lack of appreciation of reality will again come into play at that time.

For these reasons, as hard and rocky it is going to be in the short term, I have decided that I don't want to give away my peace and very precious period of my lifetime, where there is no alignment in the intent and interests. With this in mind, following are few things we have to do as a company to as quickly as possible to rewind the clock back to August 2021.

1.   Finances

  a.   Initiate the return of the capital to investors

  b.   Consolidate all the accounts and get a tally on the funds spent

  c.   Repayment plan for the funds used but not able to pay back to the investors

2.   Past Shareholders

  a.   Void the buy back shares and reissue the shares back to the previous investors in return to them returning the capital back

3.  Employees

    a.  Decide on who you want to continue or give 30 day notices to

I am sure there are plenty of other things on the company front that need to be wound down (not to mention on my personal end to put the house back on the market that we have purchased etc.). My plan is to spend in San Diego until December 25th and wrap everything up.

Thanks

PS: Request to not discuss with anyone including Kalyan, he is the one individual at this point that I am answerable to and not able to show my face to. Need sometime to discuss with him and evaluate his options.



Sekhar Puli
President & CEO

mobile: +1-571-226-7125

email: Sekhar@lifevoxel.com
www.LifeVoxel.com

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

# Exhibit G

## INVESTOR SUITABILITY QUESTIONNAIRE

I understand that my ability to purchase a Simple Agreement for Future Equity (the "**Security**") of LifeVoxel.AI Inc., a Delaware corporation (the "**Company**") depends on whether or not I am an accredited and/or sophisticated investor, within the meaning of applicable securities laws.  I represent and warrant that the responses below are true and correct (please check all applicable boxes in **each Section** and complete the responses below).

**SECTION 1:**

☐   I am an investor in securities of private companies and acknowledge that I can bear the economic risk of my investment.

☐   I have such knowledge and experience in financial or business matters that I am capable of evaluating the merits and risks of participating in this proposed investment and can protect my own interests in connection with this investment in the Company.

My experience is follows: _____

_____

☐   I have a substantial pre-existing relationship with the Company, or with a director, officer, or principal shareholder of the Company.

My relationship is as follows: _____

_____

**SECTION 2:**

☐   I am an "accredited investor" within the meaning of the Securities and Exchange Commission Rule 501 of Regulations D, as presently in effect.  The basis for my status is (*please check <u>all</u> applicable boxes under the appropriate Individual <u>or</u> Entity heading*):

☐   <u>**I AM AN INDIVIDUAL**</u>

    ☐   and my individual net worth, or my joint net worth with my spouse, exclusive of the value of my primary residence,* exceeds $1,000,000.

    ☐   and I personally have had an individual income in excess of $200,000 in each of the two most recent years and I reasonably expect an income in excess of $200,000 in the current year.

    ☐   and my joint income with my spouse is in excess of $300,000 in each of the two most recent years and I reasonably expect a joint income in excess of $300,000 in the current year.

    ☐   and I want to register the Security in the name of a revocable trust that I control solely or with my spouse, and I (individually or with my spouse) satisfy one or more of the above criteria.

*\*Indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.*

☐  **I AM AN ENTITY** *(e.g., company, partnership, limited liability company, trust or a Massachusetts or similar business trust)*

    ☐  with total assets in excess of $5,000,000 not formed for the purpose of investing in the Company.

    ☐  and each equity owner of the undersigned entity satisfies one or more of the (INDIVIDUAL) criteria, listed in Section 2 above.

    ☐  and this entity was NOT specifically formed for the purpose of investing in this Company.

☐  Please describe any other basis for being an "accredited investor": _____

_____

**The amount of funds I have invested is:  $_____**

**INDIVIDUAL INVESTOR:**

_____
*(Name of Individual)*

_____
(*Signature*)

_____
(*Street Address*)

_____
(*City, State  ZIP*)

_____
(*Phone Number*)

_____
(*Email Address*)

_____
(*Today's Date*)

**ENTITY INVESTOR:**

_____
*(Name of Entity)*

_____
(*Signature*)

_____
(*Name and Title*)

_____
(*Street Address*)

_____
(*City, State  ZIP*)

_____
(*Phone Number*)

_____
(*Email Address*)

_____
(*Today's Date*)