UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIFEVOXEL VIRGINIA SPV, LLC; SCOTT MARSCHALL; DEBBIE GALLO; KEVIN SINAGRA; SCOTT POOLE; and PETER BERSHATSKY,<br><br>                                        Plaintiffs,<br><br>v.<br><br>LIFEVOXEL.AI, INC., a Delaware Corporation; KOVEY KOVALAN, an individual; and LINH LE, an individual,<br><br>                                        Defendants. | Case No.:  22-CV-01917-GPC-MMP<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND**<br><br>**[ECF No. 73]** |

## INTRODUCTION

Before the Court is Defendant LifeVoxel.AI, Inc.; Kovey Kovalan; and Linh Le's (collectively "Defendants") Motion to Dismiss Plaintiffs LifeVoxel Virginia SPV, LLC ("LifeVoxel Virginia"); Scott Marschall; Debbie Gallo; Kevin Sinagra; Scott Poole; and Peter Bershatsky's (collectively "Plaintiffs") Second Amended Complaint ("SAC").  ECF No. 73.  For the reasons below, the motion to dismiss is GRANTED with leave to amend.

/ / /

# BACKGROUND

Defendants Kovey Kovalan ("Kovalan") and Linh Le ("Le") are spouses and owners and officers of Defendant LifeVoxel.AI, Inc. ("LifeVoxel").  ECF No. 65 ("SAC") ¶ 2.  Plaintiffs allege that Kovalan and Le fraudulently induced them to invest $3.5 million in LifeVoxel through Simple Agreements for Future Equity ("SAFE Notes").  SAC ¶ 3.  "SAFE Notes are a type of security which allow investors to contribute capital to a business entity in exchange for the ability to purchase shares of the company at a discounted rate upon a liquidity event."  SAC ¶ 3.  They are not a stock or a debt with a maturity date.  SAC ¶ 80.  SAFE Notes are classified as securities by the United States Securities and Exchange Commission ("the SEC").  SAC ¶ 79.

## I.   Development of LifeVoxel

Kovalan has developed multiple patents relating to medical records and imaging technology (the "Kovalan Patents"), and according to the SAC, he and his wife Defendant Le have "formed multitudes of businesses, changed business names, changed ownerships, operated under assumed business names, and facilitated transactions among the business entities and themselves that did not maintain arms-length" in attempt to monetize those patents.  SAC ¶ 58-59.  In 2007, Kovalan and Le organized "Voxcell Cloud."  SAC ¶ 61.  In 2016, Kovalan incorporated "AI Visualize" and assigned several of the Kovalan Patents to it.  SAC ¶¶ 62-63.  At some point, Voxcell Cloud became a wholly owned subsidiary of AI Visualize, and AI Visualize licensed the Kovalan Patents to Voxcell Cloud, which contracted with third parties for services covered by the Kovalan Patents.  SAC ¶¶ 66, 69.  Voxcell Cloud achieved "moderate success" and Plaintiffs allege that Kovalan and Le "frequently paid for their personal expenses . . . with funds from Voxcell Cloud but deliberately misclassified such payments as business expenses."

SAC ¶ 70.  In November 2019, Defendant LifeVoxel was incorporated in Delaware "as a wholly owned subsidiary of AI Visualize."[1]  SAC ¶ 71.

Kovalan met Sekhar Puli, "an experienced entrepreneur and investor," in July 2021 and eventually hired Puli to be Co-Founder, President, and Chief Executive Officer ("CEO") of AI Visualize and CEO and President of LifeVoxel to "raise capital and grow the business."  SAC ¶¶ 84, 88, 92.  Puli and other advisors recommended an "Action Plan" "to result in profitability and achievement of an eventual liquidity event" for investors.  SAC ¶¶ 93-94.  The Action Plan included (1) assigning contracts and assets from Voxcell Cloud to LifeVoxel; (2) licensing the Kovalan Patents to LifeVoxel; (3) arranging a share buyback of minority shareholders of AI Visualize; (4) using the equity freed up from the buyback "to raise capital or provide sweat equity to key stakeholders like Puli and then spin off LifeVoxel so that it is a separate entity"; (5) winding up operation of Voxcell Cloud; and (6) raising capital for LifeVoxel.  SAC ¶ 94.  The SAC alleges that Kovalan and Le agreed to implement the Action Plan.  *See* SAC ¶¶ 95, 98.  They signed a special resolution agreeing to spin LifeVoxel off as a separate entity and license the Kovalan Patents to it, SAC at 48-49 (Exhibit B), and also told Puli that Voxcell Cloud would transfer its business to LifeVoxel and cease operations, SAC ¶ 96.

## II.   Plaintiffs Invest in LifeVoxel SAFE Notes

Soon after starting as CEO and President of both LifeVoxel and AI Visualize in September 2021, Puli began to solicit investment.  SAC ¶¶ 100-01.  As part of this effort, Kovalan, "or someone at his direction," created a series of very similar presentation decks with marketing information about LifeVoxel.  SAC ¶¶ 103, 109-10.  Plaintiffs

---

[11] Just a few months earlier, Voxcell Cloud filed an application to operate under the assumed business name of "LifeVoxel.AI," SAC ¶ 68, but it is a distinct entity from Defendant LifeVoxel.AI, Inc., which the Court refers to throughout this order as "LifeVoxel."

1   allege that the presentations included multiple misrepresentations.  First, the presentations

2   listed financial information for LifeVoxel for the years 2018, 2019, and 2020 which was

3   actually the financial information of Voxcell Cloud.  SAC ¶¶ 105, 109-10.  Second, the

4   presentations stated that investment funds would be used: 60% to enrich intellectual

5   property through research and development, 20% on market outreach, and 20% on

6   "growth development," i.e. business development and sales and marketing.[2]  SAC ¶¶

7   106, 109-10.  Third and finally, the presentations represented that "previous capital

8   contributed to LifeVoxel was non-dilutive."  SAC ¶¶ 108-10.

9        In September 2021, Puli conveyed this information to some of the Plaintiffs either

10   by emailing them the presentations or in oral conversations.  *See* SAC ¶¶ 112-13

11   (Plaintiff Peter Bershatsky); ¶ 118 (Plaintiff Scott Poole); ¶ 119 (Plaintiffs Debbie Gallo

12   and Scott Marschall), ¶¶ 124, 119 (Plaintiff Kevin Sinagra).  Puli also arranged for

13   Kovalan to meet with his network of friends and family, the shareholders of Plaintiff

14   LifeVoxel Virginia, at his home in Virginia on September 10, 2021.  SAC ¶ 114.  During

15   the meeting Kovalan showed a presentation including the alleged misrepresentations and

16   conveyed some of them orally as well.  SAC ¶¶ 116-17.  Defendants and Puli provided

17   each Plaintiff with a SAFE Note agreement and a capitalization table ("cap

18   table")—which breaks down who or what owns a company's equity and in what

19   form—showing that AI Visualize owned 100% of LifeVoxel's equity.  SAC ¶ 8.

20        Together the Plaintiffs purchased $3.5 million in LifeVoxel SAFE Notes.  SAC ¶¶

21   126, 3, 174.  The agreement for these SAFE Notes proscribes that the conversion events

22   triggering the option to purchase equity are a private buyout, an initial public offering, or

23

24   _____

25   [2] The SAC indicates that one of the presentations did not include this slide, but it is not

26   clear to Court which of the presentations this was.  SAC ¶ 110; ECF No. 67 at 18

27   (sealed); ECF No. 67-1 at 11 (sealed).

28

a direct listing under the Securities Act.  SAC ¶¶ 22-23.  In total, LifeVoxel received over $5 million in SAFE Notes, including investment from individuals or entities who are not part of this suit.  SAC ¶ 3.

**III.    Alleged Fraud**

Not long after, in October 2021, after an outside accounting firm notified Puli that Voxcell Cloud was still invoicing customers for contracts, Puli spoke with Le who eventually told him that "she and [Kovalan] were running their personal expenses through Voxcell Cloud and would continue to do so using proceeds from the non-transferred contracts."  SAC ¶ 143.  The SAC alleges that LifeVoxel was therefore "collecting only 80% of the revenue due to it."  SAC ¶ 150.

In November 2021, Defendants and Puli used about $500,000 of the SAFE Notes invested in LifeVoxel to buy out minority shareholders in AI Visualize.  SAC ¶¶ 137, 147, 151.  The presentations and information provided to investors stated that their SAFE Note investments would be used 60% to enrich intellectual property, 20% on market outreach, and 20% on "growth development"—they did not mention share buybacks for the parent company.  SAC ¶¶ 106, 109-10.  Although Puli assumed that the amount would be repaid to LifeVoxel in some form, "to use as employee stock compensation and to sell to investors, including Puli," SAC ¶¶ 16, 24, the repurchased AI Visualize shares were then purchased by Kovey, LLC, a company owned by Kovalan and Le.  SAC ¶¶ 147, 51.

In the process of contacting minority shareholders in AI Visualize and in attempting to put LifeVoxel's accounts in order, Puli learned that Kovalan had already granted shares in LifeVoxel to a presumed AI Visualize shareholder and had promised shares in LifeVoxel to employees and an independent contractor.  SAC ¶¶ 138-40.  This was contrary to the statements made to investors that all prior investment in LifeVoxel was "non-dilutive."  SAC ¶ 141.  The SAC explained that "[t]he additional, undisclosed

equity interests mean that the value of the SAFE Notes is materially less than presented to Plaintiffs because in the event of a Conversion Event the value per share will be spread across more equity holders." *Id.*

Because of these incidents Kovalan and Puli's relationship began to deteriorate in late November 2021. SAC at 29-30. Puli sent an email detailing some of his concerns. SAC at 158 (Exhibit I). In response, Kovalan explained that "the plans for AI Visualize is much larger as I have shared with you, [and] I perceive its shares as currency to capitalize its vision, so [I] want to make sure we are aligned on its vision and cap table." *Id.* Kovalan also "told Puli that he wanted to continue operating AI Visualize and LifeVoxel according to his own wishes." SAC ¶ 153. The SAC alleges that after Puli offered to resign on the condition that investors would receive their money back and Kovalan agreed, Puli was fired, SAC ¶ 156, but Puli's resignation email suggests that his resignation was unconditional, SAC at 162-64 (Exhibit J).

The SAC also alleges that, unknown to investors, Kovalan had licensed some of the Kovalan Patents to entities in Russia, Germany, and India without a written agreement in place, SAC ¶ 161, had failed to use proper accounting and recording practices, SAC ¶ 162, had misclassified personal expenses as business expenses, SAC ¶ 70, and had previously declared bankruptcy for another company related to the Kovalan Patents, SAC ¶ 36.

## IV.   Procedural History

In April 2022, Plaintiffs filed a substantially similar complaint to the instant one ("*LifeVoxel I*") against the same Defendants. *See LifeVoxel Virginia SPV, LLC et al v. LifeVoxel.AI, Inc. et al*, Case No. 22-cv-00566 (S.D. Cal. Apr. 22, 2022). The Court dismissed *LifeVoxel I* in a reasoned decision after Plaintiffs failed to file an opposition to Defendants' Motion to Dismiss. *See LifeVoxel Virginia SPV, LLC v. LifeVoxel.AI, Inc.*, 622 F. Supp. 3d 935 (S.D. Cal. 2022).

22-CV-01917-GPC-MMP

On December 2, 2022, Plaintiffs filed the initial complaint in the present action. ECF No. 1.  After fully briefing Defendants' motion to dismiss the initial complaint, Plaintiffs moved for leave to amend.  ECF No. 16.  The Court granted Plaintiffs leave to amend, ECF No. 43, and Plaintiffs filed a First Amended Complaint, ECF No. 46. Defendants filed a Motion to Dismiss, ECF No. 50, which the Court granted in its entirety with leave to amend, ECF No. 62.  Plaintiffs timely filed the operative SAC, and Defendants again moved to dismiss, filing the instant motion.  ECF No. 73.  Plaintiffs responded, ECF No. 82, and Defendants replied, ECF No. 85.

## PLEADING STANDARDS

### I.  Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure ("Rule") 12(b)(6) requires dismissal for failure to state a claim upon which relief can be granted, and Rule 8(a)(2) dictates that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  A plaintiff is not required to provide "detailed factual allegations," but must plead sufficient facts that, if accepted as true, "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A complaint will survive a motion to dismiss when it contains enough facts to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  A claim is plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct charged."  *Id.* at 678. The Court must assume that all factual allegations are true but is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted).

## II.   Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act

Under Rule 9(b), claims alleging fraud are subject to a heightened pleading standard, which requires that a party "state with particularity the circumstances constituting fraud[.]"  The complaint must therefore include "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations."  *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citation and internal quotation marks omitted).

Claims under Section 10(b) of the Securities Exchange Act must also meet the pleading requirements of the Private Securities Litigation Reform Act ("the PSLRA"). *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).  The PSLRA requires the complaint to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B).  If an allegation regarding the statement or omission is made on information and belief, the plaintiff must "state with particularity all facts on which the belief is formed."  *Id.*

The PSLRA also sets out a particularly high standard for alleging scienter, "i.e., the defendant's intention to deceive, manipulate, or defraud" in making false or misleading statements or defendant's deliberate recklessness in doing so.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2008) (cleaned up); *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012).  "Reckless conduct may be defined as a highly unreasonable omission, involving not merely simple . . . negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers . . . that is either known to the defendant or is so obvious that the actor must have been aware of it."  *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc) (cleaned up).  To meet that bar, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  The alleged facts raise a

22-CV-01917-GPC-MMP

sufficiently strong inference of scienter when the culpable, "malicious inference is at least as compelling as any opposing innocent inference." *Zucco*, 552 F.3d at 991.  A court must review the allegations collectively, not just independently, to determine if a strong inference of intentional conduct or deliberate recklessness has been adequately alleged. *Id.* at 991-92.

"Rule 9(b) and the PSLRA create a significant barrier for private securities plaintiffs.  But it is not an impossible barrier[.]" *Schueneman v. Arena Pharms.*, Inc., 840 F.3d 698, 710 (9th Cir. 2016).

## DISCUSSION

The SAC asserts six causes of action: (1) violation of Section 10(b) of the Securities Exchange Act of 1934; (2) violation of Section 20(a) of the Securities Exchange Act; (3) violation of the Virginia Securities Act, Va. Code § 13.1-522; (4) violation of the Virginia Securities Act, Va. Code § 13.1-522(C); (5) common law fraud/fraud in the inducement; and (6) civil conspiracy.  ECF No. 65 at 35-41. Defendants move to dismiss all claims.

## I.      Count I: Section 10(b) of the Securities Exchange Act

Plaintiffs first allege a violation of Section 10(b) of the Securities Exchange Act and Rule 10(b)-5 promulgated thereunder.  Section 10(b) makes it unlawful for "any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or . . . for the protection of investors."  15 U.S.C. § 78(j)(b).  "SEC Rule 10(b)-5 implements this provision by making it unlawful to, among other things, 'make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were

9

made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 17 C.F.R. § 240.10b-5(b)).

To state a claim under Section 10(b) and Rule 10(b)-5, Plaintiff must allege: (1) a material misrepresentation or omission; (2) made intentionally, knowingly, or with deliberate recklessness; (3) in connection with the purchase or sale of a security; (4) reliance by the plaintiff on the misrepresentation or omission; (5) economic loss; and (6) a causal nexus between the misrepresentation or omission and the loss, i.e., loss causation. *Id.* at 37-38; *VeriFone*, 704 F.3d at 701. The Court holds that Plaintiffs adequately allege material misrepresentations and scienter but have failed to sufficiently show economic loss.

## A. Materially Misleading Statements and Omissions

Misleading statements are "any untrue statement of material fact or [omission of] a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). "[I]n other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). The standard is an objective one, and the complaint must allege facts sufficient to support the inference that there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (internal quotation marks and citation omitted).

Plaintiffs allege multiple misleading statements and omissions, all supporting the overall allegation that "the core fraud perpetrated against the investors in the SAFE Notes was the material omission that Defendants were soliciting the funds to benefit themselves and to grow the value of Kovey's shares in the parent company AI Visualize – not to

benefit LifeVoxel or its shareholders through the implementation of the Action Plan." ECF No. 82 at 14. Specifically, Plaintiffs identify three alleged misleading statements or omissions: (1) failing to inform Plaintiffs that Defendants intended to use the SAFE Note funds to buy back minority shares of AI Visualize and instead representing that they would use the funds for other purposes; (2) misrepresenting Voxcell Cloud's income and profits as LifeVoxel's, especially given that Defendants did not transfer all of Voxcell Cloud's contracts and assets to LifeVoxel; (3) misrepresenting that all prior capitalization in LifeVoxel was non-dilutive. ECF No. 82 at 18-28. The Court agrees that these were material misrepresentations.

> ### a. Omission of the fact that Defendants intended to use SAFE Notes to buy back minority shares of AI visualize

Plaintiff contends that "the first material omission is Defendants' intent to use the SAFE Note funds to buy out the minority shareholders of AI Visualize." ECF No. 82 at 18. As in the FAC, the SAC adequately alleges this was a material misrepresentation because it specified the particular information omitted, when and where it was omitted, by whom, and why it is misleading. *See* 15 U.S.C. § 78u-4(b)(1)(B) (PSLRA pleading standard); *Swartz*, 476 F.3d at 764 (Rule 9(b) pleading standard). Here, Plaintiffs plead facts showing that Kovalan or Puli, either through presentation, email, or conversation informed each Plaintiff how investment funds would be used: 60% for research and development, 20% for app marketplace outreach, and 20% for business development, sales, and marketing.[3] SAC ¶¶ 106, 109, 117-19, 124. The SAC further clarifies that

---

[3] The SAC does not allege that Bershatsky received a presentation with this particular breakdown, but incorporates an email from Puli to Bershatsky in which Puli states that the "[p]rimary usage of funds is to build – product develop, support and sales organization along with targeted market development initiatives," and clarifies that "[w]e are not expecting to spend any of these funds on general G&A[.]" SAC at 151.

1  neither Defendants nor Puli informed Plaintiffs that some of the SAFE Note funds would

2  be used to buy AI Visualize shares.  SAC at ¶¶ 127-28.

3      While "[s]ilence, absent a duty to disclose, is not misleading," *Basic Inc.*, 485 U.S.

4  at 239 n.17, Defendants and Puli told Plaintiffs explicitly how the SAFE Note funds

5  would be used, "affirmatively create[ing] an impression of a state of affairs that differs in

6  a material way from the one that actually exists."  *Brody*, 280 F.3d at 1006.  As such,

7  "Defendants were under a duty to disclose that investment funds would be used to buy

8  back shares from earlier AI Visualize investors."  ECF No. 62 at 13.

9              *b.  Representations Regarding LifeVoxel's Income*

10     Plaintiffs next contend that the income and profit from 2018 to 2020 that

11 Defendants and Puli conveyed as LifeVoxel's was a material misrepresentation because

12 the data came from Voxcell Cloud.  ECF No. 82 at 20; *see* ECF No. 67 at 11 (sealed);

13 ECF No. 67-1 at 10 (sealed).  The SAC adequately alleges the content of the alleged

14 misrepresentation and how and when Defendants and Puli conveyed it to Plaintiffs.  SAC

15 at ¶ 103 (Kovalan created or directed someone to create the LifeVoxel Long

16 Presentation), ¶ 105 (the LifeVoxel Long Presentation contained the misrepresentation),

17 ¶¶ 109-10 (the other presentations contained the information), ¶ 113 (Puli emailed

18 Bershatsky the information), ¶ 117 (Kovalan presented the presentation to Plaintiff

19 LifeVoxel Virginia), ¶ 118 (presentation emailed to Poole), ¶ 119 (Puli tells Gallo and

20 Marschall the information), ¶ 124 (Puli tells Sinagra the information).

21     As Defendants highlight, the Court previously held that this was not a material

22 misrepresentation:

23     While Defendants could have more clearly laid out the business history and
       restructuring plan for Plaintiffs and other investors, it was reasonable for
24     Defendants to assume potential investors were mostly concerned with "the
       LifeVoxel brand and its intellectual property['s] capacity to produce
25     revenue."  The presentations simply did not draw a distinction between
26

27

28
                                        12

Voxcell Cloud, AI Visualize, and the other names under which Defendants conducted business with the [Kovalan] Patents.

ECF No. 62 at 14-15; ECF No. 73-1 at 18.

Nonetheless, upon reconsideration, the Court finds that stating Voxcell Cloud's financial information for 2018-2020 as if it were LifeVoxel's is a material misrepresentation. Whether something is materially misleading is an objective standard, *see Basic Inc.*, 485 U.S. at 231, and a reasonable investor would be misled by the fact that the income and profit reported were not LifeVoxel's. Investors in LifeVoxel do not receive investment returns from Voxcell Cloud just because the companies are owned by the same parent. And while investors may be interested to know the financial history of other companies within "the brand" and the shared "intellectual property's capacity to produce revenue," ECF No. 73-1 at 20, that the data does not come from the company they are investing in but from another company within the brand is material to their decision on how or what to invest. This is evident from other allegations in the SAC which indicate that contrary to the Action Plan, roughly 20% of Voxcell Cloud's contracts and assets were *not* transferred to LifeVoxel, SAC ¶¶ 143, 150, meaning that Voxcell Cloud's income and profits were not an accurate approximation of LifeVoxel's. In short, the representation that Voxcell Cloud's income and profit was LifeVoxel's "create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006.

### c. Statements that all prior capitalization was non-dilutive

Finally, Plaintiffs assert that Defendants falsely characterized all previous capitalization in LifeVoxel as non-dilutive and provided a cap table showing that AI Visualize owned 100% of the equity in LifeVoxel. ECF No. 82 at 22. Plaintiffs previously characterized the error only as providing an incorrect cap table and the Court held that the FAC failed to plead with specificity under Rule 9(b) and the PSLRA

22-CV-01917-GPC-MMP

because it did not allege how the cap table was conveyed or who created it.  ECF No. 62 at 15-16.  The Court holds that the SAC remedies this issue.

The SAC incorporates the presentations which include the bullet point: "Previous capital: non-dilutive including innovation grants[.]"  ECF No. 67 at 18 (sealed); ECF No. 67-1 at 11 (sealed).  It alleges that Kovalan or someone at his direction made the presentations, SAC ¶ 103, 109, and that Kovalan delivered the presentation or Puli emailed it or discussed it with each of the Plaintiffs except Bershatsky.  SAC ¶¶ 110, 113, 117-19, 124.  Regarding the cap table, the SAC alleges that Kovalan created it in July 2021 and that Defendants and Puli provided it with the SAFE Note agreement itself.  SAC ¶¶ 8, 125.  Thus, the SAC alleges with sufficient particularity that Defendants made the misleading statement that all prior capitalization in LifeVoxel was non-dilutive, either by stating as such or by showing it through the cap table.

The Court finds that taking the allegations in the SAC as true, this statement was materially misleading.  The SAC alleges that there were other undisclosed equity owners in LifeVoxel, contradicting the statement that all capitalization was undiluted.  SAC ¶¶ 29, 131.  Specifically, the SAC alleges that when Puli contacted the AI Visualize minority shareholders, he discovered that one was an equity owner in LifeVoxel, with paperwork to support their ownership of LifeVoxel shares.  SAC ¶ 138.  Puli later learned that Kovalan orally promised equity to an independent contractor and to LifeVoxel employees.  SAC ¶ 139-40.  Taking these allegations as true, the Court agrees with Plaintiffs that the statement that prior capitalization was non-dilutive was materially misleading.  There is "substantial likelihood that the disclosure of [this] fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Basic Inc.*, 485 U.S. at 231-32 (internal quotation marks and citation omitted).

1    Defendants argue that LifeVoxel was entirely owned by AI Visualize and that all

2    capitalization was non-dilutive and support their argument by submitting an email from

3    Kovalan.  ECF No. 73-1 at 24.  But the Court may not consider materials outside the

4    pleadings in a Rule 12(b)(6) motion and therefore will not consider the email, Exhibit A

5    to the Declaration of Sara E. Thompson.[4]  Fed. R. Civ. P. 12(d); *Hal Roach Studios, Inc.*

6    *v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1989).  Defendants also

7    argue that Plaintiffs' SAFE Notes would not be diluted because they grant Plaintiffs the

8    right to preferred shares upon a conversion event, not common shares, and that the

9    preferred shares cannot be diluted.  ECF No. 73-1 at 25.  The SAFE Notes do grant

10   Plaintiffs preferred shares upon the occurrence of a conversion event.  SAC at 51.

11   Nonetheless, it is unclear from the SAC and attachments what the parameters of

12   LifeVoxel preferred stock are in contrast to its common stock.  The Court therefore

13   agrees with Plaintiffs that "Defendants provide no authority for their claim that there

14   would be no dilutive impact on the preferred shares if there were additional, undisclosed

15   common shares omitted from the cap table.  That is [a] question of fact that cannot be

16   resolved as part of a motion to dismiss."  ECF No. 82 at 24.

17   Accordingly, Plaintiffs have adequately alleged all three material

18   misrepresentations.

---

[4] To the extent Defendants argue that the Court may consider their exhibit because it was referenced or integral to the complaint, ECF No. 73-1 at 24, the Court rejects the argument.  Although the Court may consider a document "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim," *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018), the SAC does not refer to or even mention the email included as Defendants' exhibit.

22-CV-01917-GPC-MMP

### B. Scienter

To properly allege a securities fraud claim under Section 10(b), the complaint must plead, with particularity, the defendant's intent, knowledge, or deliberate recklessness in making the misleading statements, i.e. an intent to defraud or a deliberate recklessness in doing so. *VeriFone Holdings*, 704 F.3d at 702. Deliberate recklessness involves "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers . . . that is either known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger*, 914 F.2d at 1569 (citation omitted). A strong inference of scienter exists when the "malicious inference [from the facts pled] is at least as compelling as any opposing innocent inference." *Zucco*, 552 F.3d at 991. In assessing whether the culpable inference is at least as compelling as the innocent inference(s), the Court must consider the allegations collectively. *Id.* at 992.

In dismissing the FAC, the Court held that the FAC failed to allege scienter because its allegations were too conclusory. It explained that the FAC alleged only motive—that Defendants would benefit from committing fraud—which was insufficient on its own. ECF No. 62 at 13. It held that Puli's involvement in communicating with the Plaintiffs made the innocent inference more compelling than the malicious one because the Plaintiffs do not contend that Puli was attempting to con them. *Id.* at 14, 15.

The Court finds that the SAC has remedied these problems. The SAC alleges a series of facts that taken together make the inference that Defendants acted with reckless disregard in making the alleged misstatements and omissions at least as compelling as the inference that they acted innocently. To show scienter, Plaintiffs primarily rely on the content of the misstatements and omissions themselves and how they contradict the Action Plan. ECF No. 82 at 17-18. They argue that Kovalan and Le agreed with the Action Plan and acknowledged that spinning off LifeVoxel as a separate entity with licenses to the Kovalan Patents from AI Visualize was the only way to raise capital and

grow the business.  SAC ¶¶ 94-95, at 46.  And then Kovalan and Le acted against LifeVoxel's interest by using funds to buy out AI Visualize minority shareholders and keeping the shares for themselves and by failing to transfer all of Voxcell Cloud's contracts to LifeVoxel.  ECF No. 82 at 17.

The Court finds this somewhat persuasive, but much more convincing are the statements made by Kovalan and Le regarding this behavior.  The SAC alleges that Le explicitly told Puli that she and Kovalan "were running their personal expenses through Voxcell Cloud and would continue to do so using proceeds from the non-transferred contracts."  SAC ¶ 143.  Only a month or two earlier, Le and Kovalan had agreed that Voxcell Cloud "would cease all operations and be wound up, with all business thereafter to be completed by LifeVoxel" and Puli and Kovalan had represented Voxcell Cloud's income and profit as LifeVoxel's to investors.  SAC ¶ 96.  Moreover, the SAC also alleges that Kovalan told Puli "that he wanted to continue operating AI Visualize and LifeVoxel to his own wishes," and that Kovalan wrote in a November 21, 2021 email that "the plans for AI Visualize is much larger as I have shared with you, [and] I perceive its shares as the currency to capitalize its vision."  SAC ¶¶ 153-54.  These statements support the conclusion that Defendants never planned to comply with the Action Plan, which they agreed was necessary to grow LifeVoxel.[5]

Defendants argue Plaintiffs were never aware of the Action Plan so even if Defendants did not intend to comply with it, Plaintiffs could not have relied on it in investing in LifeVoxel.  ECF No. 73-1 at 19.  But whether Plaintiffs were aware of the

---

[5] Plaintiffs also allege multiple times that Kovalan fired Puli after he raised many of these issues, supporting the malicious inference.  SAC ¶¶ 35, 155-58.  However, the Court does not find this persuasive because in the email attached to the SAC, Puli appears to resign unconditionally.  SAC at 162-64.

Action Plan or not, that Defendants agreed it was necessary to grow LifeVoxel and then soon after violated it suggests that they did not intend to grow LifeVoxel, SAC ¶¶ 94-96, supporting the inference that they acted intentionally or with deliberate recklessness in making the misleading statements.

Other miscellaneous allegations in the SAC also support the inference of scienter. That Kovalan licensed the Kovalan Patents to foreign companies without a written agreement and without informing investors, SAC ¶ 161, that he and Le misclassified personal expenses as business expenses and failed to use proper accounting and recording practices, SAC ¶¶ 162, 70, and that he did not implement appropriate internal controls, SAC ¶ 38(b)-(c), 134, collectively support the finding that Kovalan acted with at least deliberate recklessness in misleading investors.

The Court must also consider the innocent inferences that could be drawn from these facts, but Defendants have failed to provide a persuasive innocent inference. First, Defendants contend that they did not intend to mislead investors by omitting the fact that they would use SAFE Note funds to buy back AI Visualize shares because they made the decision to buy back AI Visualize shares after the investors purchased the SAFE Notes. ECF No. 73-1 at 22-23. But the Action Plan, agreed upon in August 2021 before the SAFE Notes were purchased, included a provision to buy back AI Visualize minority shareholders, SAC ¶¶ 94-95, and Kovalan later stated that he "perceive[d] [AI Visualize's] shares as the currency to capitalize its vision," SAC ¶¶ 153-54. Second, Defendants argue that they were in the process of transferring Voxcell Cloud's contracts and assets to LifeVoxel and had already transferred 80% of them, and therefore that the financial data presented to investors as LifeVoxel's was, in effect, accurate. ECF No. 73-1 at 21. However, Le explicitly told Puli that she did not intend to transfer all of Voxcell Cloud's contracts to LifeVoxel. SAC ¶ 143. Finally, Defendants do not explain the

misrepresentation regarding non-dilutive capital except to argue that there was no misrepresentation at all, an argument which the Court has already rejected.

Another innocent explanation the Court considers is that Defendants simply assumed that investors did not care that some of their money would be invested in AI Visualize, that the revenue provided was from another company in the same brand regarding the same intellectual property, and that there were other equity owners of LifeVoxel.  But if this were true, Defendants would not have made the misleading statements.  There was no reason not to include AI Visualize minority shareholder buybacks in their description of how they were going to spend the funds, to state that the financial data was LifeVoxel's instead of Voxcell Clouds', or to represent that prior capitalization was non-dilutive.

Finally, the Court also considers that Defendants made a series of mistakes but did not intend to defraud anyone and did not act recklessly in doing so.  The Court finds that this is the most plausible of the innocent explanations, but that it is still not as compelling as the inference that they acted with deliberate recklessness in making misleading statements and omissions.  Le's statement that she would not transfer Voxcell Cloud's contracts to LifeVoxel, SAC ¶ 143, and Kovalan's statements that he would operate the companies to his own wishes and that he "perceive[s] [AI Visualize's] shares as the currency to capitalize its vision," SAC ¶¶ 153-54, are decisive for the Court.  These statements are more consistent with a scienter of intent or deliberate recklessness than simple mistakes.

The Court previously held that "it is difficult to infer malicious intent considering that Plaintiffs were in Puli's extended social and familial network" and Puli was aware of the plan to buy back AI Visualize shares and that the reported income of LifeVoxel was that of Voxcell Cloud.  ECF No. 62 at 14.  But the SAC clarifies that, at the time Plaintiffs purchased the SAFE Notes, Puli did not know that Defendants would use the

1   funds to buy AI Visualize shares without repaying LifeVoxel or using the freed-up equity

2   to LifeVoxel's benefit.  SAC ¶¶ 17, 24.  And even though Puli was aware that the

3   reported revenue was that of Voxcell Cloud instead of LifeVoxel, the SAC alleges that he

4   thought all of Voxcell Cloud's contracts and assets would be transferred to LifeVoxel,

5   meaning that the revenue would have been effectively accurate.  SAC ¶¶ 26, 96.  Thus,

6   Puli's involvement provides little support for the innocent inferences discussed above.

7   Taking all of these facts as true and viewing them holistically, *VeriFone Holdings*,

8   704 F.3d at 701-03, the Court finds the inference that Defendants acted with at least

9   deliberate recklessness is at least as compelling as the innocent inferences.

10   **C. Economic Loss**

11   Defendants also allege that the SAC fails to state a claim because it does not allege

12   economic loss.  ECF No. 73-1 at 26; *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27,

13   37 (2011) (listing the elements of a Section 10(b) claim).  There is no heightened

14   pleading standard for economic loss; the complaint must only provide a "short and plain

15   statement" of the economic loss Plaintiffs suffered.  *Dura Pharms., Inc. v. Broudo*, 544

16   U.S. 336, 346 (2005).  The existence of economic loss in securities fraud cases is

17   generally straightforward, but the nature of the SAFE Note makes the question more

18   difficult here.

19   SAFE Notes are a vehicle for investors to contribute capital to a business "in

20   exchange for the ability to purchase shares of the company at a discounted rate upon a

21   liquidity event."  SAC ¶ 75.  They are "not debt, and thus do not accrue interest or have a

22   specified maturity date."  SAC ¶ 80.  Unlike stocks, there is no way to determine the

23   present value of a SAFE Note, and unlike a more traditional convertible note or debt,

24   there is no maturity date after which it is clear that the debt is unpaid, *see, e.g.*, *Brady v.*

25   *Delta Energy & Commc'ns, Inc.*, No. 521-CV-01843, 2023 WL 2683203, at *7 (C.D.

26   Cal. Jan. 25, 2023).  In this case, the SAFE Note converts into equity "upon the

27

28

occurrence of a Conversion Event, including a private Buyout, Direct Listing under the Securities Act or an [Initial Public Offering]."  SAC ¶ 102.

In its prior decisions the Court held that Plaintiffs had not adequately pled economic loss and loss causation because "Plaintiffs did not plead facts showing that a conversion event was impossible, but rather, Plaintiffs asserted that Defendants' actions had simply made it more difficult for a conversion event to occur."  ECF No. 62 at 17-18. Defendants follow this line of reasoning in the instant motion.  Because LifeVoxel still exists and a conversion event could conceivably happen, Defendants argue that "there is no factual scenario presented in this case which forecloses an eventual return on [Plaintiff's] investment."  ECF No. 85 at 3.  Plaintiffs say little in response, contending only that Defendants' actions made a conversion event "untenable" and rendered LifeVoxel (and Plaintiffs' investments) less profitable.  ECF No. 82 at 24.

Because no other court has addressed how a SAFE Note holder can show economic loss for a claim under the Securities Exchange Act, the Court looks to the general principles governing economic loss and loss causation.  The goal of private securities fraud actions is "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause."  *Dura Pharms.*, 544 U.S. at 345.  And as the Supreme Court has explained, there are a "tangle of factors" affecting the value of a security other than the misleading statements and omissions.  *Id.* at 343.  In fact, in *Dura Pharmaceuticals*, the Supreme Court rejected the Ninth Circuit's finding that purchasing shares at an inflated price without more was enough to allege economic loss—because purchase at an artificially high price does not necessarily mean a later loss.  *Id.* at 342-43.

To show a loss on a SAFE Note, Plaintiffs must do more than show that a loss on their investment is possible or even likely.  Purchasing shares at an inflated price makes a loss possible, but the Supreme Court held that it was insufficient to show economic loss

and loss causation because it was "far from inevitably so" that the investors would suffer a loss. *Id.* at 342-43. But nor can it be that the only way for Plaintiffs to show economic loss is to show that LifeVoxel dissolved or went bankrupt, meaning that recouping their investment would be literally impossible. Rather, drawing from the language of *Dura Pharmaceuticals*, Plaintiffs must show that it is inevitable that they will not recover their investment. Though they need not show that LifeVoxel has dissolved, they need to show that it is inevitable that the company will fail or will not realize a conversion event. The Court holds that the SAC has failed to do so.

The SAC alleges the following core facts to show that "there is no likelihood of a Conversion Event":

(1) "There is no room on LifeVoxel's cap table or the cap table of AI Visualize to raise additional funds or grant sweat equity necessary to attract individuals with the experience and talent [to] grown and develop LifeVoxel's business[.]"

(2) Defendants failed to transfer all of Voxcell Cloud's contracts and revenue to LifeVoxel, contrary to the Action Plan and special resolution.

(3) The failure to maintain appropriate books, records, and internal controls, and to protect LifeVoxel's intellectual property rights prevents LifeVoxel from producing audited financial statements as required for an IPO, Direct Listing or private buyout.

SAC ¶¶ 38(a)-(d), 148, 177. In the alternative, the SAC alleges that, even if a conversion event occurs, the equity in LifeVoxel is diluted, and will represent a loss for Plaintiffs, because Defendants represented to Plaintiffs that all prior capitalization was non-dilutive even though some other parties owned or were promised equity interests in LifeVoxel. SAC ¶¶ 39, 179.

These allegations do not show that it is inevitable that a conversion event will not occur. Plaintiffs purchased SAFE Notes less than three years ago, SAC ¶ 3 (purchases in August and September 2021), a period of time shorter than the maturity period on many convertible notes, a comparable financial vehicle, *see, e.g.*, *Nuveen Mun. High Income*

*Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1117 (9th Cir. 2013) (five-year maturity period on Revenue Bond Anticipation Notes). Nor have Plaintiffs alleged facts to show that Defendants have acted against LifeVoxel's interest in the last two and a half years following Puli's departure from LifeVoxel and AI Visualize, except to note that Defendants "consistently failed to sign documents necessary for the proper record keeping" "through at least April 2022." SAC ¶ 134. In fact, the SAC alleges that the majority of Voxcell Cloud's assets and contracts were transferred to LifeVoxel and that LifeVoxel "was collecting 80% of the income due to it," SAC ¶ 150, suggesting that it still has significant ability to generate income. And though $500,000 of the SAFE Notes were funneled to the AI Visualize minority shareholder buyout, SAC ¶ 151, that left over $4 million for LifeVoxel, SAC ¶ 174 (stating that investors, Plaintiffs and others, invested over $5 million in LifeVoxel via SAFE Notes). Thus, while these allegations demonstrate Defendants made decisions that may have harmed LifeVoxel, and possibly even intentionally so, they do not show that these decisions were fundamentally destructive of the company and its ability to achieve a conversion event.

Plaintiffs' first contention that LifeVoxel cannot grow because there is no room on its cap table and therefore nothing to offer investors, SAC ¶ 38(a), is not exactly true. The SAC acknowledges that LifeVoxel could raise additional capital by authorizing the issuance of new shares. SAC ¶ 40. Lack of room on the cap table is not fatal to the company's growth. Plaintiffs' second contention, that some of Voxcell Cloud's contracts were not transferred to LifeVoxel, does not indicate that LifeVoxel is about to go under; 80% of the contracts and assets were transferred to LifeVoxel. SAC ¶ 150. Plaintiffs' third contention—that Defendants' lack of internal controls and improper accounting procedures would prevent a conversion event, SAC ¶ 38(b)-(c), also fails to indicate that LifeVoxel's demise is inevitable. Defendants' failure in 2021 to implement proper

internal controls and accounting practices does not mean that they will not implement them in the future, and the SAC does not provide facts to suggest otherwise.

Finally, Plaintiffs also seem to suggest that Defendants' alleged intent not to grow LifeVoxel and to use the SAFE Note funds for personal benefit indicate that a conversion event will never occur.  SAC ¶ 38(d).  But while the Court held that the SAC adequately alleges scienter, it did not find that Defendants *never* intend to grow LifeVoxel, only that there is a strong inference that they intentionally or with deliberate recklessness misled investors.  To demonstrate economic loss, Plaintiffs must show that LifeVoxel's failure is inevitable—a separate question from whether Defendants acted with scienter in making misleading statements.  The scienter allegation to show loss is therefore unpersuasive.

The Court also rejects Plaintiffs' alternative argument that even if a conversion event occurs, the value of the SAFE Notes would be "substantially diminished because the undisclosed equity shareholders in LifeVoxel plainly dilute the value of the SAFE Notes."  SAC ¶ 39.  The SAC similarly contends that the issuance of additional shares, to garner new investment, would further dilute the value of the SAFE Notes.  SAC ¶ 40.  But "economic loss does not necessarily accompany dilution, so such conclusory assertions of loss are insufficient."  *New York City Employees' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1023-24 (9th Cir. 2010), *overruled on other grounds by Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012) (holding that a complaint did not allege economic loss where it pled economic loss in the form of dilution of the shareholders' interests in a Section 14(a) claim).  Even if the shares were heavily diluted, depending on the purchase price in a buyout or the value of the shares in an IPO, Plaintiffs could still recoup the entirety of their investment.

Accordingly, the SAC fails to adequately allege economic loss.  Without economic loss, Plaintiffs also cannot show loss causation, i.e. that Defendants' misrepresentations have a nexus with the loss.  On these grounds, Plaintiffs' Section 10(b) claim fails and the

Court GRANTS the motion to dismiss Count I. Because this issue is one of first impression, and the parties focused almost exclusively on the questions of material misrepresentations and scienter in briefing the motion to dismiss, the Court dismisses the claim with leave to amend.

## II.   Counts II through VI

Count II for a violation of Section 20(a) of the Securities Exchange Act fails because it requires an underlying primary violation of the Securities Exchange Act. *In re Rigel Pharms., Inc. Secs. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012). For the reasons stated above, Plaintiffs have failed to adequately plead a right to relief under Section 10(b) and their Section 20(a) claim therefore also fails. The Court GRANTS the motion to dismiss Count II with leave to amend.

Count III for a violation of the Virginia Securities Act fails because Plaintiffs did not sufficiently plead economic loss, i.e. damages. Plaintiffs argue, and the Court previously acknowledged, that Va. Code § 13.1-522(A) does not require a showing of scienter, reliance, or causation, but they do not mention economic loss. *See* ECF No. 82 at 26 (absence); ECF No. 62 at 20 (prior order). The Court's prior order relied in part on the proposition that the Va. Code § 13.1-522(A) requires a showing of economic loss, ECF No. 62 at 21, and Plaintiffs do not now argue otherwise, ECF No. 82 at 26. The Court therefore GRANTS the motion to dismiss Count III with leave to amend.

Count IV alleges control person liability under the Virginia Securities Act, Va. Code § 13.1-522(C), and fails because it requires an underlying primary violation of Va. Code § 13.1-522(A)-(B). The Court therefore GRANTS the motion to dismiss Count IV. Because the Court grants leave to amend on Count III for Va. Code § 13.1-522(A), it also grants leave to amend on Count IV.

Count V for common law fraud also fails for failure to show economic loss or damages. *See Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983)

(stating the elements of common law fraud).  The Court therefore GRANTS the motion to dismiss Count V with leave to amend.

Finally, Count VI for civil conspiracy fails because it "is not an independent cause of action, and . . . must be predicated upon an underlying wrong." *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42, 74 (D. Del. 2002).  Because Plaintiffs have failed to sufficiently allege an underlying wrong, they cannot state a cause of action under Count VI.  The Court GRANTS the motion to dismiss Count VI with leave to amend.

## CONCLUSION

For the reasons stated above, the Court GRANTS the motion to dismiss without prejudice.  Plaintiffs have 30 days from the issuance of this order to file a Third Amended Complaint which addresses the damages issues identified herein.

**IT IS SO ORDERED.**

Dated:  May 7, 2024

Hon. Gonzalo P. Curiel
United States District Judge