1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                       SOUTHERN DISTRICT OF CALIFORNIA

10

11   LIFEVOXEL VIRGINIA SPV, LLC;          Case No. 3:22-CV-01917-GPC-MMP
     SCOTT MARSCHALL; DEBBIE
12   GALLO; KEVIN SINAGRA; SCOTT           **ORDER GRANTING DEFENDANTS'**
13   POOLE; and PETER BERSHATSKY,          **MOTION TO DISMISS THIRD**
                                           **AMENDED COMPLAINT**
14                         Plaintiffs,
                                           **[ECF No. 107]**
15   v.

16   LIFEVOXEL.AI, INC., a Delaware
     Corporation; KOVEY KOVALAN, an
17   individual; and LINH LE, and individual,

18                         Defendants.

19

20                            **INTRODUCTION**

21        This case involves the raising of capital through investments known as Simple

22   Agreements for Future Equity ("SAFE Notes").  SAFE Notes are not shares of stock but

23

24

25

26

27                                1

28
                                          22-CV-01917-GPC-MMP

rather nondebt convertible securities[1] that permit the holder to obtain shares of stock upon a conversion event defined as a "Change of Control, a Direct Listing or an Initial Public offering." ECF No. 96, Exhibit C, at 3. Plaintiffs allege that LifeVoxel.AI, Inc. relied on misrepresentations to lead them to invest in LifeVoxel SAFE Notes and that the misrepresentations have made a conversion event impossible, causing them economic loss.

Before the Court is LifeVoxel.AI, Inc.; Kovey Kovalan; and Linh Le's (collectively "Defendants") Motion to Dismiss LifeVoxel Virginia SPV, LLC; Scott Marschall; Debbie Gallo; Kevin Sinagra; Scott Poole; and Peter Bershatsky's (collectively "Plaintiffs") Third Amended Complaint (ECF No. 96, "TAC"). ECF No. 107. For the reasons below, the motion to dismiss is DENIED.

## FACTUAL BACKGROUND[2]

Defendants Kovey Kovalan ("Kovalan") and Linh Le ("Le") are spouses and owners and officers of Defendant LifeVoxel.AI, Inc. ("LifeVoxel"), Voxcell Cloud LLC ("Voxcell Cloud"), and AI Visualize, Inc. ("AI Visualize"). ECF No. 96 ("TAC") ¶ 2. Plaintiffs allege that Kovalan and Le fraudulently induced them to invest $3.5 million in LifeVoxel through SAFE Notes. TAC ¶ 3. Plaintiffs allege that Defendants portrayed the SAFE Notes as a way for Plaintiffs to obtain equity in LifeVoxel and receive a return on investment; the goal was to develop LifeVoxel into a leading provider of healthcare

---

[1] Spool, Aaron, *Is a SAFE Note Safe for Investors?*, Forbes.com, Dec. 10, 2021, https://www.forbes.com/councils/forbesfinancecouncil/2021/03/17/is-a-safe-note-safe-for-investors/ (last visited Dec. 19, 2024)

[2] Given that the Court is ruling on the Third Amended Complaint, the Court assumes basic familiarity with the facts, and will focus its attention on the facts that are most pertinent to the instant motion.

technology through, *inter alia*, the portfolio of patents that Kovalan owned through AI Visualize (the "Kovalan Patents").  TAC ¶ 4.

## I.    LifeVoxel and the Action Plan

According to the TAC, Defendant LifeVoxel was incorporated in Delaware in 2019 "as a wholly owned subsidiary of AI Visualize."  TAC ¶ 71.  AI Visualize had been incorporated a few years earlier, in 2016, and Kovalan had assigned several of the Kovalan Patents to it.  TAC ¶¶ 62-63.  Voxcell Cloud, for its part, had been organized by Kovalan and Le in 2007, and at some point, became a wholly owned subsidiary of AI Visualize.  TAC ¶¶ 61, 66.  AI Visualize then licensed the Kovalan Patents to Voxcell Cloud, and Voxcell Cloud contracted with third parties for services covered by the Kovalan Patents.  TAC ¶ 69.  Voxcell Cloud achieved "moderate success" and Plaintiffs allege that Kovalan and Le "frequently paid for their personal expenses . . . with funds from Voxcell Cloud but deliberately misclassified such payments as business expenses."  TAC ¶ 70.

In July 2021, Kovalan met Sekhar Puli, "an experienced entrepreneur and investor," and eventually hired Puli to be Co-Founder, President, and Chief Executive Officer ("CEO") of AI Visualize and CEO and President of LifeVoxel to raise capital and grow the business.  *See* TAC ¶¶ 84, 88, 90, 92.  After reviewing the Kovalan Patents and the structure of AI Visualize, Voxcell Cloud, and LifeVoxel, Puli and other advisors recommended an "Action Plan" "to result in profitability and achievement of an eventual liquidity event" for investors.  TAC ¶¶ 93-94.  The Action Plan included (1) assigning client contracts and business activity from Voxcell Cloud to LifeVoxel; (2) licensing the Kovalan Patents to LifeVoxel; (3) arranging a share buyback of minority shareholders of AI Visualize to clean up its capitalization table; (4) using the equity freed up from the buyback "to raise capital or provide sweat equity to key stakeholders like Puli and then spin off LifeVoxel so that it is a separate entity"; (5) winding up operation of Voxcell

Cloud; and (6) arranging a capital raise for LifeVoxel.  TAC ¶ 94.  Kovalan and Le allegedly agreed to implement the Action Plan.  TAC ¶¶ 95, 98.

## II.    Raising Capital and the Issuance of LifeVoxel SAFE Notes

Soon after starting as CEO and President of both LifeVoxel and AI Visualize in September 2021, Puli began to solicit investment.  TAC ¶¶ 100-01.  As part of this effort, Kovalan, "or someone at his direction," created a series of presentation decks about LifeVoxel.  TAC ¶¶ 103, 109-10.  Plaintiffs allege that the presentations included multiple misrepresentations.  First, the presentations listed financial information purporting to be the revenues and expenses for LifeVoxel for the years 2018, 2019, and 2020, but this was actually the financial information of Voxcell Cloud.  TAC ¶ 105.  Second, the presentations stated that investment funds would be used in the following manner: 60% to enrich intellectual property through research and development, 20% on market outreach, and 20% on "growth development," i.e., business development and sales and marketing.  TAC ¶ 106.  Third, the presentations represented that previous capital contributed to LifeVoxel was "non-dilutive."  TAC ¶ 108.

In September 2021, Puli conveyed this information to some of the Plaintiffs either by emailing them the presentations or in oral conversations.  *See* TAC ¶¶ 112, 116-118, 119, 124.  Defendants and Puli provided Plaintiffs with a SAFE Note agreement and a capitalization table ("cap table") — which itemizes who or what owns a company's equity and in what form — indicating that AI Visualize owned 100% of LifeVoxel's equity.  TAC ¶¶ 119-125.  Among other things, the SAFE Note agreements provided that the Investor "is an accredited investor" with the "knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment" and able to "incur a complete loss of such investment…and able to bear the economic risk of such investment for an indefinite period of time."  TAC, Exhibit C, at 5.

Together, the Plaintiffs purchased $3.5 million in LifeVoxel SAFE Notes.  TAC ¶ 3.  The agreement for these SAFE Notes specified that the conversion events triggering the option to purchase equity would be a private buyout, an initial public offering, or a direct listing under the Securities Act.  TAC ¶ 22.

### III.  Alleged Fraud

In November 2021, Defendants and Puli used about $500,000 of the SAFE Notes invested in LifeVoxel to buy out minority shareholders in AI Visualize.  TAC ¶¶ 137, 147.  The presentations and information provided to Plaintiffs did not indicate that their SAFE Note investments would be used towards buybacks for the parent company.  TAC ¶¶ 106, 109-10.  Although Puli assumed that the amount would be repaid to LifeVoxel in some form, *see* TAC ¶¶ 16, 24, the AI Visualize shares were then purchased by Kovey, LLC, a company owned by Kovalan and Le.  TAC ¶¶ 147, 51.

Plaintiffs allege that investor presentations reported income and profit from 2018 to 2020 for LifeVoxel, that was, in fact, generated by VoxcellCloudLLC dba LifeVoxel.AI.  TAC ¶ 6.  In October 2021, after an outside accounting firm notified Puli that Voxcell Cloud was still invoicing customers for contracts, Puli spoke with Le, who refused to transfer the contracts to LifeVoxel, because she said "she and [Kovalan] were running their personal expenses through Voxcell Cloud and would continue to do so using proceeds from the non-transferred contracts."  TAC ¶ 143.  The TAC alleges that LifeVoxel was therefore "collecting only 80% of the revenue due to it."  TAC ¶ 150.

In the process of attempting to put LifeVoxel's accounts in order, Puli learned that Kovalan had already granted shares in LifeVoxel to a purported AI Visualize shareholder and also had promised shares in LifeVoxel to employees and at least one independent contractor.  TAC ¶¶ 138-40.  This was contrary to the statements made to Plaintiffs that AI Visualize was the 100% shareholder of LifeVoxel and that all prior investment in LifeVoxel was "non-dilutive."  TAC ¶ 141.  The TAC asserts that "[t]he additional,

undisclosed equity interests mean that the value of the SAFE Notes is materially less than presented to Plaintiffs because in the event of a Conversion Event the value per share will be spread across more equity holders." *Id.*

Kovalan and Puli's relationship began to deteriorate in late November 2021. TAC ¶ 152-53. During this time, Kovalan wrote to Puli that "the plans for AI Visualize is [*sic*] much larger as I have shared with you, [and] I perceive its shares as currency to capitalize its vision, so [I] want to make sure we are aligned on its vision and cap table." TAC ¶ 154 (Exhibit I). According to the TAC, Kovalan also "told Puli that he wanted to continue operating AI Visualize and LifeVoxel according to his own wishes." TAC ¶ 153. The TAC alleges that Puli offered to resign on the condition that LifeVoxel investors received their money back, but Puli's resignation email suggests that his resignation was offered unconditionally. *See* TAC ¶ 156 (Exhibit J). In any case, Puli left LifeVoxel in late 2021. *See* TAC ¶¶ 157-59.

## IV. Additional revelations and actions since Puli's departure

After Puli's departure, Plaintiffs allegedly discovered that Kovalan and Le had created foreign entities to which they transferred funds from LifeVoxel for their own personal use. TAC ¶ 160. Plaintiffs also allegedly discovered that Kovalan and Le had disclosed confidential LifeVoxel intellectual property to companies in Russia, Germany, and India without a proper written agreement in place. TAC ¶ 161. Further, Kovalan and Le allegedly failed to use proper accounting and recording practices to "avoid IRS scrutiny and tax liability," TAC ¶ 162, and failed to keep proper recordkeeping, including bylaws, shareholder agreements, meeting minutes, and resolutions, TAC ¶ 134. Plaintiffs allege that all these actions, together with the allegation that Kovalan and Le had misclassified personal expenses as business expenses, TAC ¶ 70, support the conclusion that Kovalan and Le "never intended to use the funds [from Plaintiffs] to grow

22-CV-01917-GPC-MMP

1  LifeVoxel's business as promised… [these funds] were designed to benefit Kovalan and

2  Le personally…"  TAC ¶ 163.

3       Since the fallout between Puli and Kovalan, Defendants have "refused to respond

4  to demands by one of its outside shareholders to inspect its books and records" under

5  Section 220 of the Delaware General Corporation Law ("DGCL").  TAC ¶ 174.  Since

6  Plaintiffs are not shareholders, they have no equivalent rights of inspection.  *Id.*

7       There have been several legal actions arising from these allegations, including

8  before this same Court.[3]  In addition, there have been at least two other legal proceedings

9  in other courts, including a case in federal court in Connecticut[4] (the "Federal

10  Connecticut Action") and an arbitration proceeding[5] (the "Arbitration Action").

## PROCEDURAL HISTORY

12       On December 2, 2022, Plaintiffs filed the initial complaint in the present action.

13  ECF No. 1.  Plaintiffs were later granted leave to amend, and they filed their First

14  Amended Complaint ("FAC").  ECF Nos. 43, 46.  Defendants filed a Motion to Dismiss,

15  which the Court granted in its entirety with leave to amend.  ECF Nos. 50, 62.  Plaintiffs

16  filed a Second Amended Complaint ("SAC"), and Defendants moved to dismiss.  ECF

17  Nos. 65, 73.  The Court granted the Defendants' motion to dismiss with leave to amend.

18  ECF No. 95.  Plaintiffs filed the operative Third Amended Complaint ("TAC").  ECF No.

---

[3] *LifeVoxel Virginia SPV, LLC et al v. LifeVoxel.AI, Inc. et al*, No. 3:22-cv-566-GPC-JLB, 622 F. Supp.3d 935 (S.D. Cal. 2022) (dismissing without prejudice); *LifeVoxel.AI, Inc. et al v. Khan et al*, No. 3:24-cv-01339-GPC-MMP (voluntarily dismissed by LifeVoxel.AI et al).

[4] Complaint, *AI Visualize, Inc. v. Sekhar Puli*, No. 3:22-cv-00941 (D. Conn.) (July 27, 2022) (TAC, Exhibit K).

[5] *Puli v. AI Visualize, Inc. and LifeVoxel.AI, Inc.*, AAA Case No. 01-22-0001-7176 (TAC, Exhibit L).

22-CV-01917-GPC-MMP

96.  Defendants moved to dismiss, Plaintiffs responded, and Defendants replied.  ECF Nos. 107, 113, 120.

## PLEADING STANDARDS

### I.     Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure ("Rule") 12(b)(6) requires dismissal for failure to state a claim upon which relief can be granted.  A plaintiff is not required to provide "detailed factual allegations," but must plead sufficient facts that, if accepted as true, "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A complaint will survive a motion to dismiss when it contains enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  A claim is plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct charged." *Id.* at 678.

The Court accepts well-pled factual allegations as true and construes them in the light most favorable to the plaintiff.  *See Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011) (citing *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055) (9th Cir. 2008.  However, the Court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead*, 536 F.3d at 1055 (citation omitted).

### II.    Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act

Claims alleging fraud, including securities fraud, are subject to the heightened pleading standard under Rule 9(b), which requires that a party "state with particularity the circumstances constituting fraud[.]"  The complaint must therefore include "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citation and internal quotation marks omitted).  In this Circuit, a plaintiff must

plead with particularity all elements of a securities fraud claim, including economic loss and loss causation, under Rule 9(b).  *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

Claims brought under Section 10(b) of the Securities Exchange Act must also meet the pleading requirements of the Private Securities Litigation Reform Act ("the PSLRA").  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). The PSLRA requires the complaint to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1)(B).  If an allegation regarding the statement or omission is made on information and belief, the plaintiff must "state with particularity all facts on which the belief is formed."  *Id.*

"Rule 9(b) and the PSLRA create a significant barrier for private securities plaintiffs," but not an "impossible" one.  *Schueneman v. Arena Pharms.*, Inc., 840 F.3d 698, 710 (9th Cir. 2016).

## DISCUSSION

The TAC asserts six causes of action: (1) violation of Section 10(b) of the Securities Exchange Act of 1934; (2) violation of Section 20(a) of the Securities Exchange Act; (3) violation of the Virginia Securities Act, Va. Code Ann. § 13.1-522; (4) violation of the Virginia Securities Act, Va. Code Ann. § 13.1-522(C); (5) common law fraud; and (6) civil conspiracy.  TAC ¶¶ 185-227.  Defendants move to dismiss all claims.

## I.    Count I: Section 10(b) of the Securities Exchange Act

Plaintiffs allege a violation of Section 10(b) of the Securities Exchange Act and Rule 10(b)-5 promulgated thereunder.

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege the following elements: "(1) material misrepresentation or omission, (2) scienter, (3)

22-CV-01917-GPC-MMP

connection with the purchase or sale of a security, (4) reliance, often referred to as transaction causation; (5) economic loss, and (6) loss causation." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, *Cal*., 730 F.3d 1111, 1118 (9th Cir. 2013) (citing *Dura Pharm. Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)).

In the Court's previous order dismissing the SAC with leave to amend, the Court found that Plaintiffs had sufficiently alleged the following omission or misrepresentations: (1) an omission of the fact that Defendants intended to use SAFE Notes to buy back minority shares of AI Visualize; (2) misrepresentations regarding Life Voxel's financial information and income, and (3) misrepresentations that all prior capitalization in LifeVoxell was non-dilutive and that AI Visualize owned 100% of the equity in LifeVoxel.  ECF No. 95 at 11-15.  The Court held that Plaintiffs adequately alleged all elements except for economic loss and loss causation.  The Court now considers whether Plaintiffs have remedied this fault through their Third Amended Complaint.

**A. Economic Loss and Loss Causation**

To prevail, Plaintiffs must allege "actual economic loss."  *Nuveen*, 730 F.3d at 1118.  The "usual measure of damages" for securities fraud claims is out-of-pocket loss. *Ambassador Hotel Co. v. Wei-Chuan Inv*., 189 F.3d 1017, 1030 (9th Cir. 1999).

Under the PSLRA, a plaintiff has the "burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).  The misrepresentation does not need to be the sole cause of the injury suffered, but it must be a "substantial cause."  *See In re Daou Sys., Inc*., 411 F.3d 1006, 1025 (9th Cir. 2005) (citing *Robbins v. Koger Props., Inc*., 116 F.3d 1441, 1447 n.5 (11th Cir. 1997)).  Plaintiffs must show that the alleged misrepresentations or omissions proximately caused the alleged harm.  *Nuveen*, 730 F.3d at 1118. Since loss causation is a "fact-specific" inquiry, it is "normally inappropriate to

rule on loss causation at the pleading stage." *In re CytRx Corp. Sec. Litig.,* 2017 WL 5643161, at *11 (C.D. Cal. Aug. 14, 2017) (citing *In re Gilead*, 536 F.3d at 1057).

Generally, "to satisfy the loss causation requirement, the plaintiff must show that the revelation of [the relevant] misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff." *Nuveen*, 730 F.3d at 1119 (quoting *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425–26 (3d Cir. 2007)). This "burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.'" *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (quoting *Halliburton Co. v. Erica John Fund, Inc.*, 573 U.S. 258, 264 (2014)). This form of causation is known as the "fraud-on-the market" theory. However, this is not the only way to meet the pleading burden. There are an "'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause," *First Solar Inc.*, 881 F.3d at 753–54, and a complaint need only "raise a reasonable expectation that discovery will reveal evidence of 'loss causation,'" *In re Gilead*, 536 F.3d at 1057 (citation omitted).

In addressing § 10(b) claims, and especially the loss causation element, the Ninth Circuit has recognized the difference between typical "fraud-on-the-market" scenarios involving publicly-traded securities and non-typical § 10(b) scenarios concerning shares of a privately held company or an "inefficient" market. *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1053 (9th Cir. 2011). It is more difficult to categorize the required loss causation in a "non-typical" § 10(b) case because "[i]n the absence of a responsive market price, 'the factual predicates of loss causation fall into less of a rigid pattern.'" *Nuveen*, 730 F.3d at 1120 (quoting *McCabe*, 494 F.3d at 426)); *WPP Luxembourg Gamma*, 655 F.3d at 1053 ("With a privately held company, a comparison of market stock price to establish loss causation has less relevance because

11

market forces will less directly affect the sales prices of shares of a privately held company.").

With SAFE Notes, the loss causation analysis is even more difficult to perform because not only are these Notes not publicly traded, but, unlike shares of stock, their value over time cannot be tracked.   SAFE Notes are a "relatively new type of security,"[6] under which, "depending on the terms of the individual instrument, an investor's cash generally converts to equity in the issuing company under conditions specified in the SAFE."  TAC ¶ 75.  SAFE Notes are often used to provide financing to a company until the company can "complete an additional capital raise or a sale of the Company and [the SAFE Note] will often convert to equity upon the occurrence of that future specified event."  TAC ¶ 76. This future specified event, or "conversion event," could take the form of a private buyout, a direct listing under the Securities Act, or an initial public offering (IPO).  *See* TAC ¶ 102.  Unlike stocks, SAFE Notes do not represent any presently-held equity, and unlike a more traditional convertible note, SAFE Notes do not constitute debt, and thus there is no maturity date.  *See, e.g., Brady v. Delta Energy & Commc'ns, Inc.*, No. 5-21-CV-01843, 2023 WL 2683203, at *7 (C.D. Cal. Jan 25, 2023).  Further, SAFE Notes, unlike shares of stock, do not confer any rights of a stockholder, including the right to inspect the financial records of the issuing company.  TAC ¶¶ 38, 174.

Here, in response to the Court's previous order that the element of economic loss in the context of a SAFE Note investment requires pleading that a conversion event is impossible, *see* ECF No. 95, Plaintiffs allege that misrepresentations "based on the adoption of the Action Plan and Defendants' omissions regarding their Secret Plan to

---

[6] SAFE Notes were introduced by Y Combinator in 2013.  Levy, Carolynn, *Safe Financing Documents*, Y Combinator, https://www.ycombinator.com/documents (last visited October 16, 2024).

22-CV-01917-GPC-MMP

benefit the parent company instead" were a substantial factor in causing economic loss and rendering a conversion event impossible.  TAC ¶ 181.

However, the misrepresentations that were actually communicated to the Plaintiffs (and which purportedly induced them to invest in LifeVoxel) have *no* causal connection to the Action Plan or Secret Plan.  TAC ¶¶ 4-10.  Instead, what was communicated to Plaintiffs during investor presentations boils down to three misrepresentations or omissions.  *See* TAC, Exhibit D.  Plaintiffs fail to connect these three misrepresentations or omissions to the economic loss at issue: the impossibility of a conversion event. Instead, Plaintiffs spill much ink in their amended complaint discussing an Action Plan, a Secret Plan, the lack of internal controls and improper accounting procedures, and current and past litigation – none of which appears to have any causal connection with the three misrepresentations made to Plaintiffs.

The Court first reviews these red-herring arguments made by Plaintiffs.  Then, the Court examines each of the three identified misrepresentations or omissions actually communicated to Plaintiffs, and concludes Plaintiffs have failed to plausibly allege that the revelation of an alleged misrepresentation or omission was a substantial factor in rendering a Conversion Event impossible.  In short, Plaintiffs have failed to plead the element of loss causation.

### 1.  The Action Plan, internal bookkeeping, and other litigation

Plaintiffs have made claims that a conversion event has been made impossible due to a number of other factors, such as Defendants' failure to spinoff according to an Action Plan, their lack of internal controls and improper accounting procedures, and concurrent litigation.  These deficiencies may bear on possible economic loss, but, Plaintiffs must plead loss *causation*, which requires Plaintiffs to demonstrate that a loss has been caused by a qualifying misrepresentation or omission, not unwise or reckless business decisions.  First, Plaintiffs allege that Defendants' Secret Plan to refuse to spin-

off LifeVoxel from AI Visualize and to divert resources to AI Visualize rather than LifeVoxel "inevitably doomed" LifeVoxel from being able to land investments and achieve a conversion event. TAC ¶¶ 176, 182-83. This allegation is conclusory and is not directly related to one of the three misrepresentations. In addition, Defendants argue that the TAC "does not identify any factual basis for the claim that Defendants have not effectuated the spin-off as contemplated or have otherwise prevented the spin-off from occurring in such a way that would preclude a future conversion event." ECF No. 107-1 at 11. Plaintiffs fail to show how refusing to follow the Action Plan inevitably means that a conversion event will not take place.

To the extent that the spin-off of LifeVoxel from AI Visualize, which is part of the Action Plan, is tied to a misrepresentation to investors that SAFE Note funds would only be used for specific identified purposes and not to buy back AI Visualize minority shares, the misrepresentation and omission are addressed herein below.

Second, Plaintiffs have argued that the failure to maintain appropriate books, records, and internal controls, and to protect LifeVoxel's intellectual property rights prevented LifeVoxel from producing audited financial statements as required for an IPO, Direct Listing, or private buyout. SAC ¶ 38(b)-(c); 134-36; 161-62. However, the Court did not find that there were misrepresentations or omissions relating to the accounting practices of the Defendants. Instead, the Court considered these allegations holistically in finding that the misrepresentations and omission were made with scienter. ECF No. 95 at 18.

Now, Plaintiffs allege new facts that they believe support the inference that Defendants have not and will not prevent the "inevitable demise" of LifeVoxel. ECF No. 113 at 13. Specifically, they allege that Defendants have refused to respond to the demands of an outside shareholder "to inspect its books and records" under Section 220 of the Delaware General Corporation Law, which allows stockholders to access corporate

books and records for a proper purpose.  TAC ¶ 174.  Plaintiffs allege that this creates a
reasonable inference that LifeVoxel is in "dire financial distress," *id*., and that this shows
Defendants "will not in the future" try to avoid LifeVoxel's inevitable demise, ECF No.
113 at 13.  Plantiffs fail to tether these facts to the misrepresentations.

Further, despite what Plaintiffs assert, the Court does not find that denying a
shareholder access to the books and records, by itself, means that LifeVoxel is in a dire
financial situation or that it will refuse to keep good books in the future.  And the Court
notes that there is little detail on the specifics of what allegedly happened.  The
shareholder is unidentified; the reason behind the records request unspecified; and
LifeVoxel's specific response unstated.  *See* TAC ¶ 174.

Finally, Plaintiffs point to the litigation in this Court, the Federal Connecticut
Action, and the Arbitration Action as indicating that a conversion event will not happen.
To support their contention, Plaintiffs attached as exhibits to their TAC the complaint (by
AI Visualize, Inc. and LifeVoxel.AI, Inc.) in the Federal Connecticut Action, and the
answer and counterclaim (by AI Visualize and LifeVoxel.AI, Inc.) in the Arbitration
Action.  TAC, Exhibit K; Exhibit L (respectively).  Specifically, Plaintiffs note that
Defendant LifeVoxel.AI, Inc., in its Arbitration Action, alleged that a third-party investor
who had been interested in investing $10 million into the company pulled out because of
the lawsuits that LifeVoxel was a part of.  TAC ¶ 39(c) (Exhibit L).  In addition,
Plaintiffs point to the Federal Connecticut Action, where LifeVoxel acknowledged that
the company is "dependent upon an influx of investments in order to survive and grow."
TAC ¶ 177; Exhibit K ¶ 61.  And because new investments are not coming in, due to the
deleterious impact of these lawsuits, Plaintiffs argue that a conversion is not happening.

Even if this was true – even if a conversion event has now been made impossible
due to the dark cloud of litigation hovering over LifeVoxel – Plaintiffs still fail to connect
the litigation actions to the three misrepresentations at issue here.  There is no allegation

22-CV-01917-GPC-MMP

that the Federal Connecticut Action and the Arbitration Action are at all concerned with, or spurred on by, the identified misrepresentations.  There is simply no causal link.  Even though it is "normally inappropriate to rule on loss causation at the pleading stage," *In re Gilead,* 536 F.3d at 1057, the Court is not required to accept as true "allegations that are merely conclusory", *id*. at 1055.

### 2.  Misrepresentations and omissions

The Court now examines the following omission or misrepresentations: (1) an omission of the fact that Defendants intended to use SAFE Notes to buy back minority shares of AI Visualize; (2) misrepresentations regarding Life Voxel's financial information and income, and (3) misrepresentations that all prior capitalization in LifeVoxel was non-dilutive and that AI Visualize owned 100% of the equity in LifeVoxel.  *See* ECF No. 95 at 11-15 (Court's prior order finding that these misrepresentations or omissions were made).  Plaintiffs need to plead not only that they have suffered economic loss, but that the loss was caused by these misrepresentations. Under Plaintiffs' theory of economic loss, this means that Plaintiffs need to show that these misrepresentations caused the impossibility of a conversion event, or – elsewhere in the chain of causation – caused Defendants to not follow the Action Plan or caused the initiation of other litigation actions.  Plaintiffs fail to do so.

### a.  Representation that Defendants intended to use SAFE Notes to buy back minority shares of AI Visualize

The TAC alleges that the Plaintiffs were all told that investment funds would be used as follows: 60% for research and development, 20% for app marketplace outreach, and 20% for business development, sales and marketing.  TAC ¶ 5.  It further alleges that Defendants failed to inform Plaintiffs that they intended to use $500,000 in SAFE Note proceeds to buy back shares of AI Visualize as part of a "Secret Plan." TAC ¶ 24.  The Court previously found that the alleged use of the SAFE Note funds for personal benefit

22-CV-01917-GPC-MMP

1    did not indicate that a conversion event will never occur.  ECF No. 95 at 24.  The Court

2    also rejected the alternative argument that if a conversion event occurred, the value of the

3    SAFE Notes would be substantially diminished because the undisclosed equity

4    shareholders in LifeVoxel diluted the value of the SAFE Notes.  While the misuse of the

5    SAFE Note funds could evidence the scienter of the Defendants, it did not plausibly

6    allege that a conversion event would not occur.

7        In their TAC, Plaintiffs do not provide any specific allegations connecting the use

8    of SAFE Note proceeds to buy back shares of AI Visualize with the inevitable demise of

9    LifeVoxel.  Instead, Plaintiffs allege that Defendants' misrepresentations to Plaintiffs,

10   which were "based on the adoption of the Action Plan" and Defendants' omissions

11   regarding "their Secret Plan to benefit the parent company instead," substantially caused

12   Plaintiffs economic loss because the combined failure to follow the Action Plan, deemed

13   necessary to LifeVoxel's growth, and the execution of the Secret Plan instead rendered a

14   Conversion Event impossible for LifeVoxel.  TAC ¶¶ 181-84.  First, the Action Plan was

15   not part of any presentation to investors.  Plaintiffs did not rely on the Action Plan to

16   justify their investment.  In addition, it is unclear how Defendants' omission of the fact

17   that they intended to use the SAFE Notes to buy back minority shares of AI Visualize

18   caused the impossibility of a conversion event.  In fact, it is quite possible that using the

19   SAFE Notes to buy back minority shares of AI Visualize was actually beneficial to

20   LifeVoxel's financial health in the long run.  To the extent that Defendants diverted

21   $500,000 of the Plaintiffs' $3.5 million investment, the allegation that it rendered a

22   Conversion Event impossible is conclusory.

23       **b.  Representation regarding LifeVoxel's Financial Information and**

24       **Income**

25       The Court previously found that Defendants misrepresented LifeVoxel's financial

26   information and income in their investor presentations to Plaintiffs.  ECF No. 95 at 11-

27                                    17

28                                                   22-CV-01917-GPC-MMP

15.  The investor presentations purported to disclose the revenues and expenses of LifeVoxel for the years 2018, 2019, and 2020 plus the period of October 2020 through April 2021, but this information allegedly reflected *Voxcell Cloud*'s revenues and expenses.  TAC ¶ 105.

As Defendants point out in their Motion, Plaintiffs fail to show how "misrepresenting the company's financials and/or structure to the Plaintiffs was the proximate cause of the Defendants' refusal to spinoff LifeVoxel" or the proximate cause of any economic loss suffered.  ECF No. 107 at 11.  There is no allegation that connects this misrepresentation with the impossibility of a conversion event.  In other words, Plaintiffs have not pled how misrepresenting financial information led to LifeVoxel's inevitable non-conversion, or to Defendants' failure to follow the Action Plan, or to the other litigation actions.  Plaintiffs' insufficient pleading here thus cannot create a causal link between this misrepresentation and the impossibility of a conversion event.

### c.  Representation That All Prior Capitalization Was Non-Dilutive

The Court previously found that Defendants made a misrepresentation that all prior all prior capitalization in LifeVoxel was non-dilutive and that AI Visualize owned 100% of the equity in LifeVoxel.  ECF No. 95 at 11-15.  However, in the same order, the Court had found unpersuasive Plaintiffs' argument that LifeVoxel could not grow because there was no more room on its cap table.  The Court stated that "[l]ack of room on the cap table is not fatal to the company's growth."  ECF No. 95 at 23.  This is because LifeVoxel could always issue new shares.  And while Plaintiffs had argued in the SAC that the issuance of additional shares would further dilute the value of the SAFE Notes, SAC ¶ 40, the Court rejected this argument, noting that economic loss does not necessarily accompany dilution.  ECF No. 95 at 24.

Plaintiffs now allege that the cap table problem cannot be solved by simply issuing new shares because potential investors "have been driven off" by public disclosures of

22-CV-01917-GPC-MMP

the Defendants' alleged misconduct in pending litigation.  ECF No. 113 at 8.  To support their contention, Plaintiffs point to the Federal Connecticut Action and the Arbitration Action.  TAC Exhibit K; Exhibit L (respectively).  As discussed above, while other litigation actions could support the finding that a conversion event is impossible (and that therefore Plaintiffs have suffered an economic loss), Plaintiffs still need to plead a *causal* connection between the representation that all prior capitalization was non-dilutive and this purported economic loss, *see supra*.  There is no allegation that the misrepresentation about prior capitalization or about AI Visualize's 100% ownership led to these litigation actions.  Thus, Plaintiffs have failed to plead loss causation here as well.  The Court thereby GRANTS with prejudice Defendants' motion to dismiss Count I for a violation of 10(b) of the Securities Act.

## II.    Count II: Section 20(a) of the Securities Exchange Act

Count II for a violation of Section 20(a) of the Securities Exchange Act fails because it requires an underlying primary violation of the Securities Exchange Act. *In re Rigel Pharms., Inc. Secs. Litig*., 697 F.3d 869, 886 (9th Cir. 2012).  For the reasons stated above, Plaintiffs have failed to adequately plead a right to relief under Section 10(b) and their Section 20(a) claim therefore also fails.  The Court GRANTS the motion to dismiss Count II with prejudice.

## III.    Counts III and IV: Virginia Securities Act

Under the Virginia Securities Act, a plaintiff must allege a material misrepresentation, *see* Va. Code Ann. § 13.1-522(A)-(B), but the Fourth Circuit has "decline[d] to read the elements of reliance and causation into the Act," *Dunn v. Borta*, 369 F.3d 421, 432-33 (4th Cir. 2004); *see Carlucci v. Han*, 907 F. Supp. 2d 709, 739 (E.D. Va. 2012) (interpreting *Dunn* to hold that the Virginia law does not have an element of causation); *Brown v. Charles Schwab & Co., Inc*., 2009 WL 4809426, at *6 (D. S.C. Dec. 9, 2009) (same); *Bateman Litwin N.V. v. Swain*, 2008 WL 11378796, at

22-CV-01917-GPC-MMP

*10 (E.D. Va. June 5, 2008) (same); *Cook v. John Hancock Life Ins. Co*., 2015 WL 178108, at *21 (W.D. Va. Jan. 14, 2015) (same); *Winzeler v. Sanchez*, 2015 WL 12645001, at *6 n.5 (E.D. Va. July 28, 2015) (same).  Because the matter of SAFE Notes under the Virginia Securities Act is one of first impression, and because the Court dismisses the federal causes of action, the Court declines to exercise supplemental jurisdiction over Plaintiffs' Virginia state law claims.  *See* 28 U.S.C. § 1367(c) (district courts may decline to exercise supplemental jurisdiction over a claim that raises a novel or complex issue of state law or if the court has dismissed all claims over which it has original jurisdiction).  The Court therefore DISMISSES Counts III and IV without prejudice to refiling in state court.

## IV.    Count V: Common Law Fraud/Fraud in the Inducement under Delaware Law

To establish a claim of common law fraud, a plaintiff must prove (1) a false representation made by the defendant; (2) the defendant's knowledge or belief that the representation was false or reckless indifference to the truth; (3) an intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction was taken in justifiable reliance on the misrepresentation; and (5) the plaintiff suffered damages as a result of the misrepresentation.  *See Stephenson v. Capano Dev., Inc*., 462 A.2d 1069, 1074 (Del. 1983) (laying out the elements of common law fraud).

Since the element of damages in the context of SAFE Notes is a matter of first impression for Delaware law, and since the Court has dismissed the federal causes of action in this complaint, *see* 28 U.S.C. § 1367(c), the Court declines to exercise supplemental jurisdiction over this claim of common law fraud, and DISMISSES without prejudice Count V.

## V.    Count VI: Civil Conspiracy under California and Delaware Law

22-CV-01917-GPC-MMP

To establish a civil conspiracy claim, Plaintiffs must allege that (1) there was a formation of an agreement to commit wrongful acts; (2) there was a commission of unlawful acts in furtherance of a conspiracy; and (3) actual damages were suffered. *Morris v. Homecomings Fin., LLC*, No. 07-cv-2122-L, 2008 WL 3126258, at *4 (S. D. Cal. Aug. 4, 2008).

Because civil conspiracy must be predicated on an underlying wrong, and the Court has dismissed the other claims in this case, the Court declines to exercise supplemental jurisdiction over this state law claim and thus DISMISSES Count VI without prejudice to refiling in state court.

## CONCLUSION

For the reasons stated above, the Court GRANTS Defendants' motion to dismiss with prejudice as to Counts I and II and GRANTS Defendants' motion to dismiss without prejudice as to Counts III thru VI.

**IT IS SO ORDERED.**

Dated:  December 30, 2024

Hon. Gonzalo P. Curiel
United States District Judge

21

22-CV-01917-GPC-MMP